PUBLISHED

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.

SPENCER BOWENS, a/k/a Scooter,
a/k/a Clyde, a/k/a Melvin McCurdy,
a/k/a Doc Johnson,
Defendant-Appellant.

No. 99-4060

Appeal from the United States District Court
for the Eastern District of Virginia, at Richmond.
Robert E. Payne, District Judge.
(CR-98-110)

Argued: February 29, 2000

Decided: August 18, 2000

Before NIEMEYER, MICHAEL, and TRAXLER, Circuit Judges.

_____

Affirmed in part and vacated in part by published opinion. Judge
Michael wrote the opinion, in which Judge Niemeyer and Judge Trax-
ler joined.

_____

COUNSEL

**ARGUED:** Craig Stover Cooley, Richmond, Virginia, for Appellant.
David John Novak, Assistant United States Attorney, Richmond, Vir-
ginia, for Appellee. **ON BRIEF:** Helen F. Fahey, United States Attor-
ney, Richmond, Virginia, for Appellee.

_____

**OPINION**

MICHAEL, Circuit Judge:

A federal jury in the Eastern District of Virginia convicted Spencer Bowens of conspiracy to possess and distribute crack cocaine, powder cocaine, and heroin, in violation of 18 U.S.C. § 846; two counts of harboring a fugitive from arrest, in violation of 18 U.S.C. § 1071; and obstruction of justice, in violation of 18 U.S.C.§ 1503. Bowens appeals his conviction and sentence for conspiracy and his convictions for harboring a fugitive. He argues (1) that his conspiracy conviction must be reversed because the district court refused to instruct the jury on multiple conspiracies, (2) that his two convictions for harboring must be reversed because of improper venue, and (3) that his life sentence for conspiracy to distribute crack cocaine must be set aside because it is impossible to tell from the jury's verdict whether he was convicted for conspiracy to distribute crack or heroin. We conclude that the evidence did not support the existence of multiple conspiracies, so we affirm the conspiracy conviction. Because Bowens' acts of harboring, the sole essential conduct element of the charged offense, occurred outside the Eastern District of Virginia, venue in that district was improper. We therefore vacate the harboring convictions. Finally, we hold that the district court committed plain error by sentencing Bowens for conspiracy to distribute crack cocaine in the absence of a special verdict. However, we decline to notice that plain error in light of the overwhelming, uncontroverted evidence that Bowens did in fact conspire to distribute crack cocaine. We therefore affirm Bowens' sentence on the conspiracy count.

I.

The drug conspiracy charged in this case concerned a large crack distribution network known as the "Poison Clan." The Poison Clan started out in Brooklyn, New York, in the mid-to-late 1980s. Later, it extended north to Albany and the outskirts of Boston and south to Baltimore, Washington, Richmond, Raleigh, Charlotte, and Columbia, among other cities. Couriers used cars outfitted with secret compartments to transport crack from New York to points north and south. (They made some deliveries of powder cocaine to the Carolinas, where it then was cooked into crack.) The couriers returned to

2

New York with the proceeds, which were substantial. For example, by the end of 1993 the organization's Richmond operations, where shifts of dealers sold crack 24 hours a day, generated as much as $80,000 per week. At the same time, the organization was making weekly deliveries of crack to Albany and Baltimore while it looked for still other opportunities to expand.

A man named Dean Beckford was the head of the Poison Clan. Bowens was Beckford's confederate, eventually overseeing the organization's crack dealing operations in North and South Carolina. Bowens' responsibilities included procuring drugs for couriers to deliver to co-conspirators in the Carolinas, arranging meetings between couriers and local dealers, and (on at least one occasion) cooking powder cocaine into crack. In March 1994 Bowens traveled from New York to Columbia, South Carolina, where he remained long enough to set up a crack distribution operation on behalf of the Poison Clan. Beckford sent couriers to Columbia with cocaine; Bowens sent them back to Beckford with cash. Beckford and Bowens referred to one another as "partners" and split the proceeds from the organization's Carolina drug operations equally between themselves. Other members of the organization testified that receiving a command from Bowens was tantamount to receiving a command from Beckford and that Bowens was Beckford's "surrogate."

In May 1995 members of the Poison Clan's Richmond contingent began to suspect that they were under government surveillance. Wary of the increased attention, Beckford and the man who oversaw the Richmond operations, Ricardo Laidlaw, closed up shop in Richmond. Laidlaw relocated to Brockton, Massachusetts, where he continued to distribute crack for the Poison Clan. In Brockton the organization once again attracted the attention of the police, forcing Laidlaw to abandon that location and return to New York. The move provided little cover, however, for in New York the members of the Poison Clan found that "federal agents [were] everywhere." Throughout the summer of 1996 Bowens and Laidlaw repeatedly warned Beckford that he was "hot," and the three men began to discuss plans for going into hiding. Bowens had family in South Carolina, and he suggested that Beckford and Laidlaw could hide there without attracting the attention of the police. When Bowens' aunt died in late August 1996, he drove Beckford's Cadillac to St. Stephens, South Carolina, to attend

3

the funeral. While there, he registered the car in the name of his cousin, Harold Bowens, and obtained South Carolina plates.

Bowens and Laidlaw's fears that the police were closing in were well founded. On June 7, 1996, a federal grand jury in the Eastern District of Virginia had returned a sealed indictment charging twenty-three members of the Poison Clan, including Beckford and Laidlaw, with conspiracy to distribute crack and powder cocaine. Additional charges against Beckford included two counts of murder. That same day, arrest warrants had also been issued (under seal) for all twenty-three defendants. Bowens was not indicted in this first round.

Over the course of the summer of 1996 the FBI and the New York City Police Department located most of the indicted members of the Poison Clan. The FBI carried out a coordinated arrest plan in New Haven, New York, Richmond, and Fort Lauderdale on August 26, 1996. Although Beckford and Laidlaw were in New York on that day, they and a third member of the Poison Clan, Mark Phillips, successfully evaded arrest. The three decided that it was time to flee New York. Beckford called Bowens in South Carolina, informed him of the FBI's push to make arrests, and told him that they were heading south to meet him. Before leaving, however, Beckford obtained four kilograms of cocaine powder to supply the organization's North Carolina market.

Garth Sambrano drove Beckford, Laidlaw, and Phillips to Wilmington, North Carolina, where they met up with Bowens and yet another member of the ring, David Armstrong. In Wilmington, Beckford, Laidlaw, and Bowens discussed the fact that Beckford and Laidlaw were wanted by the authorities. Armstrong and Sambrano were excluded from these conversations, however, since they were not "in the inner circle." After a few days in Wilmington, Beckford, Bowens, Laidlaw, Phillips, and Armstrong drove to St. Stephens. They stayed there for the next few weeks at the home of Armstrong's parents, who were also cousins of Bowens.

From St. Stephens, Beckford arranged for a courier to deliver powder cocaine to Sambrano in Raleigh. When the drugs arrived, Beckford, Bowens, Laidlaw, Phillips, and Armstrong drove to Raleigh, where Armstrong had an apartment. Beckford, Bowens, and Laidlaw

4

cooked the cocaine powder into crack and then turned it over to Sambrano for distribution. Bowens directed Laidlaw to"tip" Armstrong $200 for the use of his apartment, and Laidlaw did so.

In early October 1996 Beckford and Bowens decided to return to New York, where Beckford's fiancee still lived and where Beckford planned to get a phony New Jersey driver's license with Bowens' help. While in New York, Beckford continued to send cocaine to Laidlaw in Raleigh. After about a month Beckford returned to Raleigh, while Bowens, who had been shot and wounded in the meantime, stayed behind in New York. Beckford was not gone for long, however; in late November he drove back to New York to buy an engagement ring for his fiancee. A few days later, on November 26, 1996, Beckford was arrested in Oceanside, New York.

Upon learning of Beckford's arrest, Bowens telephoned Laidlaw. Bowens urged Laidlaw to work with him to "keep the operation going." Laidlaw and the other North Carolina members of the group continued selling the crack that they had on hand, periodically sending cash to Bowens in New York. In January 1997 Bowens persuaded Laidlaw, Phillips, and Sambrano to send him $55,000 in cash for more crack that Bowens promised to ship. The money was sent, but Bowens never delivered the drugs. In August 1997 Laidlaw and Phillips were arrested in North Carolina. They cooperated with the authorities and provided information that led to Bowens' indictment and arrest in the spring of 1998. The indictment charged Bowens with one count of conspiracy to distribute crack cocaine, powder cocaine, and heroin; two counts of concealing a person from arrest; one count of money laundering; and one count of obstruction of justice, for instructing a grand jury witness to lie.[1]

At trial Bowens requested a multiple conspiracy instruction, which the district court denied. Bowens also requested a jury instruction that would have required the government to prove venue on the harboring charges, that is, that the acts of harboring occurred in the Eastern District of Virginia. Bowens argued that the government's evidence showed acts of harboring only in South Carolina. The district court

_____

[1] The money laundering charge was eventually dismissed by the government.

5

denied the request for a venue instruction, reasoning that since the arrest warrants for Beckford and Laidlaw were issued in the Eastern District of Virginia, venue was established there as a matter of law. The jury convicted Bowens on the conspiracy count, both counts of concealing a person from arrest, and the one count of obstruction of justice. The district court sentenced Bowens to life in prison for the conspiracy conviction. Bowens also received concurrent sentences of 60 months for each of his two convictions for harboring and 120 months for obstruction of justice. He appeals his conviction and sentence for conspiracy and his convictions for harboring.[2]

II.

We first address Bowens' argument that the district court committed reversible error when it denied his request to instruct the jury on multiple conspiracies. The gist of Bowens' argument is that the government's own evidence demonstrated that the various groups in the (alleged) single conspiracy lacked any mutual interest in sustaining an overall enterprise. Consequently, Bowens contends, the evidence supported a conclusion that there were multiple, competing conspiracies rather than a single, overarching one. We disagree.

"A court need only instruct on multiple conspiracies if such an instruction is supported by the facts." United States v. Mills, 995 F.2d 480, 485 (4th Cir. 1993). Bowens argues that the facts show that the distributor groups in the various cities each had their own interests that placed them at odds with one another, thereby precluding a single conspiracy. For example, Bowens relies on evidence that deliveries of crack to Richmond were sometimes delayed because the couriers went to the Carolinas first, that Richmond distributors for the Poison Clan did not share in the proceeds from drug sales in the Carolinas, and that Bowens ripped off his North Carolina accomplices by stealing $55,000 from them. None of this evidence suggests multiple conspiracies. Occasionally favoring the Carolina distributors as drugs

_____

[2] Bowens initially challenged all of his convictions on the ground that the government had violated 18 U.S.C. § 201(c)(2) by offering his coconspirators lenity in exchange for their testimony. Bowens has withdrawn that challenge in light of our recent decision in United States v. Richardson, 195 F.3d 192, 194-97 (4th Cir. 1999).

were resupplied was a business decision that did not undermine the existence of the single conspiracy. Nor does the fact that members were only compensated for their own transactions disprove their participation in a single, broad conspiracy. Finally, the fact that Bowens stole from his confederates does not mean they were not in business together.

A single conspiracy exists when there is an agreement to engage in one overall venture to deal in drugs. See United States v. Leavis, 853 F.2d 215, 218 (4th Cir. 1988). Bowens suggests that because he had nothing to do with the Poison Clan's Richmond contingent, he was not part of some big conspiracy that included Richmond. The government, however, proved that the Poison Clan was a large crack distribution ring, led by Beckford, that operated up and down the East coast, including in Richmond. And Bowens had a hand in most of what Beckford did. Bowens was intimately involved in the leadership of the Poison Clan. He and Beckford referred to each other as "partners," and Bowens was described as Beckford's surrogate and as a member of "the inner circle." At one point, Bowens was dispatched to set up a crack distribution operation in South Carolina. Bowens was also Beckford's counselor and confidant, advising him to flee New York when Beckford became "hot." He arranged a hiding place for Beckford so that when Beckford evaded capture the first time, their drug partnership was able to continue. Bowens provided Beckford with a falsified South Carolina vehicle registration and a phony New Jersey driver's license. While Beckford hid out in the Carolinas he and Bowens continued to run the drug ring together, arranging the delivery of powder cocaine, cooking the powder into crack, distributing the crack to dealers, and sharing equally in the proceeds. When Beckford finally was arrested, Bowens said he wanted to "keep the operation going." Other factors also linked the Poison Clan's various distribution units, including those in the Carolinas where Bowens devoted much of his efforts. The several contingents of the Clan used common methods of operation (the same drug couriers using the same means of transporting and concealing the drugs). They also had common participants (Beckford and Laidlaw, among others) and common leadership and direction (Beckford). Rather than showing multiple conspiracies, the evidence showed that the members of the Poison Clan, including Bowens, were linked by a "mutual interest in sustaining [one] overall enterprise," an enterprise based on a single conspir-

7

acy. See United States v. Banks, 10 F.3d 1044, 1054 (4th Cir. 1993). Because the evidence did not support the existence of multiple conspiracies, the district court did not err in refusing to instruct the jury on this subject.

III.

Bowens also appeals his two convictions for harboring or concealing a fugitive from arrest, arguing that venue for those offenses was not proper in the Eastern District of Virginia. There was no evidence that Bowens engaged in any act in the Eastern District of Virginia to harbor or conceal Beckford or Laidlaw. Nonetheless, the government makes two alternative arguments to support its venue selection: first, that venue was proper in the Eastern District of Virginia because an element of the offense (issuance of the warrant) occurred there; second, that venue was proper because Bowens' offense interfered with the administration of justice in the Eastern District of Virginia. Because both of these arguments fail, we vacate Bowens' harboring convictions.

A.

Proper venue in a criminal prosecution is a constitutional right: "The Trial of all Crimes . . . shall be held in the State where the said Crimes shall have been committed." Art. III,§ 2, cl. 3. Article III's command is reinforced by the Sixth Amendment, which provides a criminal defendant with the right to a trial "by an impartial jury of the State and district wherein the crime shall have been committed." See also Fed. R. Crim. P. 18 ("Except as otherwise permitted by statute or these rules, the prosecution shall be had in a district in which the offense was committed."). The government bears the burden of proving venue (by a preponderance of the evidence). See United States v. Barsanti, 943 F.2d 428, 434 (4th Cir. 1991). When a defendant is charged with multiple counts, venue must be proper on each count. See United States v. Smith, 198 F.3d 377, 382 (2d Cir. 1999).

While the venue rule -- trial in the district where the crime is committed -- seems straightforward, the place of the crime can be difficult to determine. Of course, Congress can prevent some of that difficulty by including an express venue provision in a criminal stat-

8

ute. See, e.g., 18 U.S.C. § 228(e) (designating venue in prosecutions for failure to pay child support); 18 U.S.C. § 1073 (designating venue in prosecutions for flight to avoid prosecution or giving testimony); 18 U.S.C. § 1074(b) (same); 18 U.S.C. § 1512(h) (designating venue in prosecutions for obstruction of justice and witness or juror tampering). When Congress does not indicate just where it considers the place of the crime to be, the place "must be determined from the nature of the crime alleged and the location of the act or acts constituting it." United States v. Anderson, 328 U.S. 699, 703 (1946). As the Supreme Court has recently instructed, "[i]n performing this inquiry, a court must identify the conduct constituting the offense (the nature of the crime) and then discern the location of the commission of the criminal acts." United States v. Rodriguez-Moreno, 526 U.S. 275, 279 (1999). The inquiry into the place of the crime may yield more than one appropriate venue, see 18 U.S.C. § 3237(a), or even a venue in which the defendant has never set foot, see Hyde v. United States, 225 U.S. 347 (1912). In any event, the district "where the criminal act is done . . . determines the jurisdiction" where the case must be tried. Anderson, 328 U.S. at 705.

Here, the relevant statute, 18 U.S.C. § 1071, contains no venue provision.**3** Thus, as the Supreme Court has instructed, we must determine (1) the "nature of the crime" of concealing a person from arrest (the conduct constituting the offense) and (2) the location of that criminal conduct. See Rodriguez-Moreno, 526 U.S. at 279. Section 1071 prohibits "harbor[ing] or conceal[ing] any person for whose arrest a warrant or process has been issued under the provisions of any law of the United States, so as to prevent his discovery and arrest, after notice or knowledge of the fact that a warrant or process has been issued for the apprehension of such person." Thus, there are four essential elements of a harboring offense: (1) that a federal warrant had been issued for a fugitive's arrest, (2) that the defendant knew that the war-

_____

**3** Section 1071 is part of Title 18, ch. 49, which contains four sections dealing with fugitives from justice. The proper venue for a § 1071 prosecution appears to be a question of first impression. Likewise, we do not know of any case discussing the proper venue for a prosecution under § 1072, which prohibits harboring or concealing an escaped prisoner. The remaining two sections of Title 18, ch. 49 contain explicit venue provisions. See 18 U.S.C. §§ 1073, 1074.

rant had been issued, (3) that the defendant harbored or concealed the fugitive, and (4) that the defendant intended to prevent the fugitive's discovery or arrest. See United States v. Silva , 745 F.2d 840, 848 (4th Cir. 1984).

In order to prove that a defendant has illegally harbored a fugitive from arrest, the government must prove that somebody (other than the defendant) was a fugitive. Accordingly, the issuance of a federal arrest warrant is an essential element of the government's case. Venue does not necessarily lie, however, in every district where an essential element of the offense has transpired. Rather, venue is limited to the place "where the criminal act is done." Anderson, 328 U.S. at 705. See also United States v. Cabrales, 524 U.S. 1, 7-8 (1998). We understand this requirement to limit venue in a criminal trial to the place of the essential conduct elements of the offense. The only conduct proscribed by § 1071 is the act of harboring or concealing the fugitive. Consequently, venue will lie only where acts of harboring or concealing take place.

Our conclusion that venue is limited to the place where the essential conduct elements occur, without regard to the place where other essential elements of the crime occur, is compelled by the Supreme Court's two recent decisions dealing with venue in criminal prosecutions, United States v. Cabrales, 524 U.S. 1 (1998), and United States v. Rodriguez-Moreno, 526 U.S. 275 (1999). In the first case, Cabrales was indicted in Missouri for laundering money generated by Missouri drug sales. Although she also was indicted as a co-conspirator in the Missouri drug activity, see United States v. Cabrales, 109 F.3d 471, 472 (8th Cir. 1997), Cabrales had laundered the money exclusively in Florida. The Missouri district court dismissed the money laundering charges for lack of proper venue, the government appealed, and the Eighth Circuit affirmed. At the Supreme Court the government pointed out that an essential element of a money laundering charge under 18 U.S.C. §§ 1956(a)(1)(B)(ii), 1957(a) is proof that the funds in question were the product of criminal activity. In Cabrales' case that criminal activity occurred in Missouri, so venue was proper there, the government argued. See Cabrales, 524 U.S. at 7-8. The Supreme Court disagreed unanimously:

> Whenever a defendant acts "after the fact" to conceal a crime, it might be said, as the Government urges in this

10

case, that the first crime is an essential element of the second, and that the second facilitated the first or made it profitable by impeding its detection. But the question here is the place appropriate to try the "after the fact" actor. As the Government recognizes, it is immaterial whether that actor knew where the first crime was committed. The money launderer must know she is dealing with funds derived from "specified unlawful activity," here, drug trafficking, but the Missouri venue of that activity is, as the Eighth Circuit said, "of no moment."

Id. (internal citations omitted). Since Cabrales' money laundering conduct occurred entirely in Florida, venue was not proper in Missouri. See id. at 10.

The very next term the Supreme Court decided Rodriguez-Moreno. In that case the defendant (Rodriguez-Moreno) was charged with a violation of 18 U.S.C. § 924(c)(1), which makes it a crime to "use[ ] or carr[y] a firearm" "during and in relation to a crime of violence." On the way to being charged with a gun crime, Rodriguez-Moreno had kidnaped a drug dealer, held him for a few days in New Jersey, and then moved him to another location in Maryland. While in Maryland Rodriguez-Moreno obtained a gun and used it to threaten the victim. Rodriguez-Moreno was later tried and convicted in the District of New Jersey on the § 924(c)(1) (gun) charge. The Third Circuit reversed the gun conviction for improper venue, reasoning that Rodriguez-Moreno had neither "used" nor "carried" the gun in New Jersey. See United States v. Rodriguez-Moreno , 121 F.3d 841, 850 (3d Cir. 1997). The Supreme Court reinstated the conviction. The court of appeals had erred, the Supreme Court held, because it "overlooked an essential conduct element of the § 924(c)(1) offense," specifically, the requirement that the defendant commit a crime of violence. See Rodriguez-Moreno, 526 U.S. at 280.

Significantly, the Rodriguez-Moreno Court distinguished Cabrales by observing that the "existence of criminally generated proceeds" was only a "circumstance element" of money laundering. See Rodriguez-Moreno, 526 U.S. at 280 n.4. The "circumstance element" was supplied by proof of a prior crime, one committed before the money laundering conduct began. See Cabrales, 524 U.S. at 7-8. The

11

"`anterior criminal conduct that yielded the funds allegedly laundered'" therefore did not provide a basis for venue. See Rodriguez-Moreno, 526 U.S. at 280 n.4 (quoting Cabrales, 524 U.S. at 7); see also Cabrales, 524 U.S. at 8 n.2 (citing United States v. Lanoue, 137 F.3d 656, 661 (1st Cir. 1998) (stating that for crime of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1), venue lies only where the firearm is actually possessed)). In contrast, the underlying crime of violence required by § 924(c)(1) was an "essential conduct element" of that offense. See Rodriguez-Moreno, 526 U.S. at 280 & n.4. In other words, committing a crime of violence is conduct the defendant himself engages in as part of the gun offense under § 924(c)(1). Thus, only the essential conduct elements of an offense, not the circumstance elements, provide a basis for venue. Applying that distinction to § 1071, it is clear that the issuance of a warrant for a person's arrest is merely a circumstance element (albeit an essential element) of the harboring offense. The place where that warrant is issued, like the place of the drug trafficking in Cabrales, is "of no moment."**4**

We therefore hold that the place where a criminal offense is committed is determined solely by the essential conduct elements of that offense. We further hold that the only essential conduct element of harboring or concealing a fugitive from arrest under 18 U.S.C. § 1071 is the act of harboring or concealing. It thus follows that venue in the Eastern District of Virginia cannot be predicated on the fact that the arrest warrants for Beckford and Laidlaw were issued there.

_____

**4** At first blush, it might seem that this rule imposes a significant limitation on permissible venues. It does not. In determining venue for a particular offense, not only is the conduct of the defendant himself considered, but the conduct of anyone with whom he shares liability as a principal is as well. Thus, in a conspiracy charge, venue is proper for all defendants wherever the agreement was made or wherever any overt act in furtherance of the conspiracy transpires. See Hyde , 225 U.S. at 356-67. Likewise, a defendant who is charged as an aider or abettor is subject to venue in any place where the principal could be tried. See id. at 362-67; United States v. Smith, 198 F.3d 377, 383 (2d Cir. 1999). Finally, as we explain in greater detail below, see part III.B., venue is proper where the effects of criminal conduct are felt when Congress defines the essential conduct elements of the offense in terms of those effects.

12

B.

We turn now to the government's alternative argument that venue was proper in the Eastern District of Virginia because the act of harboring or concealing a fugitive from arrest interferes with the due administration of justice in the district where the warrant was issued. As the government points out, we previously have held that in determining the proper venue for criminal prosecutions, the inquiry into the "nature of the crime" permits, indeed requires, an inquiry into Congress's purposes in enacting a particular criminal statute. See United States v. Murphy, 117 F.3d 137, 139 (4th Cir. 1997); United States v. Cofield, 11 F.3d 413, 416-17 (4th Cir. 1993). Using that approach, we have looked to the effect that Congress sought to prevent by criminalizing specific conduct and have held that venue is proper wherever that effect is felt. See Murphy , 117 F.3d at 140; Cofield, 11 F.3d at 419. The government specifically relies on a line of cases in which we have held that in prosecutions for crimes in the nature of obstruction of justice, venue is proper in the district where the obstruction would take effect. See Cofield , 11 F.3d at 419; United States v. Kibler, 667 F.2d 452, 454-55 (4th Cir. 1982). According to the government, harboring a fugitive is similar in nature to obstruction of justice in that it impedes the due administration of justice in the court that issued the arrest warrant. As a result, the government argues, venue for a § 1071 prosecution should lie in the district where the effects of the criminal conduct are felt, that is, where the arrest warrant was issued.

We do not reach the question whether harboring a fugitive is in some sense an obstruction of justice crime. Instead, we conclude that the Supreme Court's recent decisions in Cabrales  and Rodriguez-Moreno require us to determine venue solely by reference to the essential conduct elements of the crime, without regard to Congress's purpose in forbidding the conduct. Venue may nevertheless be proper where the effects of criminal conduct are felt, but only when an essential conduct element is itself defined in terms of its effects. We elaborate further below.

As we have already discussed, in Anderson the Supreme Court laid out the two-part inquiry that guides venue analysis in the absence of explicit direction from Congress: the place of committing the crime

13

"must be determined from the nature of the crime alleged and the location of the act or acts constituting it." Anderson, 328 U.S. at 705. Our own venue decisions have construed the command to determine "the nature of the crime" as requiring an examination of the legislative purpose of the criminal statute at issue. See Murphy, 117 F.3d at 139; Cofield, 11 F.3d at 416-17. For example, in Cofield the defendant had assaulted a witness in retaliation for her testimony in a criminal trial, in violation of 18 U.S.C. § 1513(a) (now § 1513(b)). Although the assault took place in the District of Columbia, Cofield was tried and convicted in the Eastern District of Virginia, the place of the trial. We acknowledged that the conduct proscribed by § 1513(a) -- "caus[ing] bodily injury to another person" with intent to retaliate for that person's testimony in an official proceeding -- had taken place exclusively in the District of Columbia. Nonetheless, we consulted the legislative history of § 1513 and determined that "the congressional purpose in enacting the statute was to protect the integrity of the judicial system," Cofield, 11 F.3d at 417, making § 1513 something of an obstruction of justice statute. We then relied on other cases and statutes involving obstruction of justice ("crimes of the same genre," id. at 419) to hold that venue for prosecution of a crime that threatens the integrity of the judicial process lies wherever the judicial process is affected. Venue for Cofield's prosecution therefore was proper in the Eastern District of Virginia. See id. at 418-419.

Our reasoning in Cofield, however, cannot be reconciled with the Supreme Court's later decisions in Cabrales and Rodriguez-Moreno. Rather, the Supreme Court's recent venue decisions instruct that "the nature of the crime" refers only to the conduct constituting the offense, see Rodriguez-Moreno, 526 U.S. at 279, and that the conduct constituting the offense is limited to essential conduct elements, see id. at 279 n.2; Cabrales, 524 U.S. at 7-9. Accord Cofield, 11 F.3d at 421-24 (Luttig, J., dissenting); United States v. Murphy, 117 F.3d 137, 142 (4th Cir. 1997) (Williams, J., concurring). Our conclusion that venue must be determined solely by reference to the proscribed conduct is compelled by the Supreme Court's unanimous opinion in Cabrales. Emphasizing that the Florida money laundering at issue in that case facilitated drug activity in Missouri and impeded its detection, the government urged the Court to consider "the interests of the community victimized by drug dealers." Cabrales, 524 U.S. at 8, 9. In making this argument, the government explicitly and extensively

14

relied on the legislative history of the money laundering statute. See Brief for the United States, Cabrales, No. 97-643, 1998 WL 90828, at *14 ("Congress has criminalized money laundering precisely because it facilitates the profitable commission of the underlying offenses."); id. at 1998 WL 90828, *17 ("Congress viewed money laundering as a logical and prevalent outgrowth of the specified unlawful activities." (citing S. Rep. No. 433, 99th Cong., 2d Sess. 2, 4 (1986); H.R. Rep. No. 855, 99th Cong., 2d Sess. Pt. 1, at 8, 13 (1986)); id. at 1998 WL 90828, *18-19 ("[T]he determination that particular funds were illegally derived is central to the purpose and proper application of the federal money laundering provisions."). The Court refused to adopt the government's reasoning or to consider the effects of money laundering on the Missouri community at all. See Cabrales, 524 U.S. at 9. The unmistakable import of that refusal is that proper venue is limited to the place where the defendant's criminal acts are committed, without respect to Congress's underlying purposes in criminalizing those acts.

At the same time, we do not understand the Supreme Court's recent decisions to have altered the well-established rule that Congress may, consistent with the venue clauses of Article III and the Sixth Amendment, define the essential conduct elements of a criminal offense in terms of their effects, thus providing venue where those effects are felt. See United States v. Johnson, 323 U.S. 273, 275 (1944) (observing that the Constitution permits Congress to "provide that the locality of a crime shall extend over the whole area through which the force propelled by an offender operates"); see also Rodriguez-Moreno, 526 U.S. at 279 n.2 (declining to reach government's argument that "venue may be based upon the effects of a defendant's conduct other than the one in which he performs the acts constituting the offense"). Thus, in a prosecution under the Hobbs Act, venue is proper in any district where commerce is affected because the terms of the statute itself forbid affecting commerce in particular ways. See 18 U.S.C. § 1951 (anyone who "in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce" by robbery, extortion, or threat of violence to person or property is subject to criminal penalties); United States v. Stephenson, 895 F.2d 867, 875 (2d Cir. 1990); United States v. Lewis, 797 F.2d 358, 367 (7th Cir. 1986). Similarly, a former version of 18 U.S.C. § 1503 prohibited influencing, intimidating, or impeding a witness or

15

influencing, obstructing, or impeding the administration of justice. Because the essential conduct elements were defined not just in terms of the forbidden act, i.e., "assault" or "retaliate," but rather in terms of their effects (intimidation of a witness or obstruction of the administration of justice), venue was proper in the district where those proscribed effects would be felt. See Kibler, 667 F.2d at 454-55 (4th Cir. 1982) (construing 18 U.S.C. § 1503 (1981)); see also United States v. Bradley, 540 F. Supp. 690, 694-95 (D. Md. 1982) (in prosecution for "causing" a destructive device or substance to be placed on an aircraft, in violation of 18 U.S.C. § 32(a)(2), venue lay in the district where an innocent third party placed the defendant's bomb on a plane). Those decisions are consistent with the requirement that venue be predicated solely on essential conduct elements. This is because the criminal statutes involved in those cases did not merely proscribe particular acts, but actually defined the essential conduct elements in terms of their particular effects, e.g., "affecting" interstate commerce and "obstructing" or "impeding" the administration of justice.

When Congress defines the essential conduct elements of a crime in terms of their particular effects, venue will be proper where those proscribed effects are felt. The essential conduct element of § 1071, "harboring or concealing a person," is not defined in terms of its particular effects. The statute does, however, contain the words "so as to prevent [the fugitive's] discovery and arrest." In some circumstances, "prevent" might be an essential conduct element that is described in terms of its effects. See, e.g., 18 U.S.C. § 593 (officer or member of the armed forces who "prevents or attempts to prevent . . . any qualified voter of any State from fully exercising the right of suffrage at any general or special election" commits a crime); 18 U.S.C. § 1169(b) (any person who "inhibits or prevents" certain individuals from making reports of child abuse in Indian country commits a crime); 18 U.S.C. § 1509 ("Whoever, by threats or force, willfully prevents . . . or willfully attempts to prevent . . . the due exercise of rights or the performance of duties under any order, judgment, or decree of a court of the United States" commits a crime). Here, however, the language "so as to prevent [the fugitive's] discovery and arrest" defines the requisite intent for the offense of harboring, not an essential conduct element. See Silva, 745 F.2d at 848. Because § 1071 contains no other language that might be construed as an essential conduct element, venue for a prosecution under that section is proper

16

only where defendant actually harbors or conceals a fugitive. Thus, the possible disruption of the administration of justice in the district issuing the arrest warrant is of no consequence in determining venue for a prosecution under § 1071. We therefore hold that the district court erred in considering the effect of Bowens' harboring offense in determining venue.

C.

In summary, we hold that venue for a criminal prosecution must be determined solely in reference to the essential conduct elements of the charged offense. Venue will lie wherever those essential conduct elements have occurred. Venue will also lie where the effects of the defendant's conduct are felt, but only when Congress has defined the essential conduct elements in terms of those effects. The sole essential conduct element of 18 U.S.C. § 1071 is the act of concealing a fugitive, and that conduct is defined in the statute without reference to its effects. Bowens' acts of harboring occurred outside the Eastern District of Virginia. We therefore hold that venue in that district was improper, and we vacate Bowens' two convictions for violation of 18 U.S.C. § 1071.**5**

IV.

Last, Bowens challenges his life sentence on the drug conspiracy conviction. The indictment charged Bowens with conspiracy to distribute crack cocaine, powder cocaine, and heroin. The district court instructed the jury that it should convict on the conspiracy charge if it found beyond a reasonable doubt that Bowens had entered an agreement to distribute any of those three substances. Neither Bowens nor the government requested a special verdict, and the jury returned a general verdict of guilty. At sentencing, without objection from Bowens, the district court calculated his sentence on the assumption that the object of the conspiracy had been distribution of crack cocaine. On that basis, Bowens received a life sentence. Bowens now argues that it is impossible to determine which of the charged objects of the

_____

**5** Because we vacate Bowens' § 1071 convictions for lack of venue, we need not reach his argument that the evidence of harboring or concealing was insufficient to sustain the verdict.

17

conspiracy (distribution of crack cocaine, cocaine powder, or heroin) the jury convicted him on. Consequently, Bowens contends, the district court committed plain error by imposing the sentence based on the most heavily punishable object of the conspiracy. We agree that the district court committed plain error at sentencing. However, we may excuse Bowens' failure to raise the issue in the district court, and notice the error ourselves, only if it seriously affects the fairness, integrity, or public reputation of the judicial proceedings. We conclude that the evidence of a crack conspiracy was so overwhelming that there is no question that the jury must have found Bowens guilty of conspiracy to distribute crack cocaine. Accordingly, we decline to notice the error and we affirm the sentence.

When a jury returns an ambiguous guilty verdict in a multiple-drug conspiracy, the defendant "may be sentenced only up to the maximum for the least-punished drug offense on which that conspiracy is based." United States v. Rhynes, 196 F.3d 207, 238 (4th Cir. 1999), rev'd in part on rehearing in banc, No. 97-4466, 2000 WL 929704 (4th Cir. July 10, 2000). See also Edwards v. United States, 523 U.S. 511, 515 (1998); United States v. Quicksey, 525 F.2d 337, 340-41 (4th Cir. 1975). The statutory maximum sentence for conspiracy to distribute the quantity of heroin proved at trial (27.56 grams) is twenty years. See 21 U.S.C. § 841(b)(1)(C). As a result, Bowens argues, he must be retried on the conspiracy count or resentenced consistent with conviction for a heroin conspiracy. See Rhynes , 196 F.3d at 239-40; Quicksey, 525 F.2d at 341.

Since Bowens did not object to the general verdict, request a special verdict, or object to being sentenced based on conspiracy to distribute crack cocaine, we review his claim for plain error. See Rhynes, 196 F.3d at 237; Fed. R. Crim. P. 52(b). "Rule 52(b) contains three elements that must be established before we possess the authority to notice an error not preserved by a timely objection: The asserted defect in the trial proceedings must, in fact, be error; the error must be plain; and, it must affect the substantial rights of the defendant." United States v. Cedelle, 89 F.3d 181, 184 (4th Cir. 1996) (citing United States v. Olano, 507 U.S. 725, 731-32 (1993)). Even when all three of these elements are present, we should decline to notice an error unless it "`seriously affect[s] the fairness, integrity or public rep-

18

utation of judicial proceedings.'" Olano, 507 U.S. at 736 (quoting United States v. Atkinson, 297 U.S. 157, 160 (1936)).

The first three requirements easily are satisfied here, since we found the identical error to be plain and to affect substantial rights in Rhynes. See Rhynes, 196 F.3d at 237-40. Nonetheless, we are convinced that the fourth factor is not present: the error works no injustice and does not "seriously affect[ ] the fairness, integrity, or public reputation of the judicial proceedings." Olano, 507 U.S. at 736. In contrast to Rhynes, in this case it is not"impossible to determine on which statutory object or objects . . . the conspiracy conviction was based." Rhynes, 196 F.3d at 238. Rather, the overwhelming and essentially uncontroverted evidence shows that Bowens was a major participant in a large crack distribution conspiracy. Therefore, we decline to notice the error.

This was not a trial about a heroin conspiracy. Every government witness who testified about the conspiracy testified to crack dealings, preparation of crack, and delivery of either crack cocaine itself or powder cocaine to be cooked into crack. Laidlaw testified that in June 1992 the Poison Clan was delivering three to four kilograms of crack cocaine to Richmond every month. By the end of 1993 a courier named Wayne Douglas Smith was making weekly deliveries of crack to Richmond (and returning with $70,000 to $80,000 in proceeds), even as he made other crack deliveries to representatives of the Poison Clan in Albany and Baltimore. In May of 1996 yet another courier was delivering between two and two-and-a-half kilograms of crack cocaine to Richmond two or three times a month. Once Bowens was in the Carolinas, a courier named Alfred Cockfield made at least two deliveries to Raleigh, each time consisting of four kilograms of cocaine powder. Three different witnesses testified about Bowens helping to cook one of those four-kilogram deliveries into crack for North Carolina distribution. The substance of this testimony was essentially uncontroverted, as the defense was almost exclusively directed at attempting to impeach the government's witnesses. See United States v. Williams, 152 F.3d 294, 300 (4th Cir. 1998) (declining to notice plainly erroneous instruction on "use or carry" element of 18 U.S.C. § 924(c) in light of "overwhelming" and "essentially uncontroverted" evidence that defendant carried a firearm during and in relation to a drug trafficking crime).

19

In contrast to this overwhelming evidence of a large, complex network dedicated to buying powder cocaine, cooking it into crack, distributing it to cities along the east coast, and delivering the cash proceeds back to the organization's leaders in New York, no witness testified to buying, manufacturing, or selling heroin. The only testimony pertaining to heroin at all was that of Sharon Gelzer, a courier who was arrested while making a delivery for Bowens, and that of the police officer who arrested her. Gelzer was arrested with two kilograms of cocaine powder and 27.56 grams of heroin in a piece of luggage that Bowens had given her to carry. On a previous occasion, Gelzer testified, she had successfully delivered two kilograms of (presumably powder) cocaine from Bowens to another member of the organization, Willie Richardson, in South Carolina. Thus, assuming that the jury believed Gelzer's testimony that she was involved in one delivery of heroin for Bowens, it likewise would have believed her testimony that she was involved in the delivery of at least two, if not four, kilograms of powder cocaine from Bowens to the organization's South Carolina dealers. And we know that Bowens' confederates would have cooked that powder cocaine into crack because the only evidence concerning the organization's South Carolina activity was that it sold crack there. Consequently, even the isolated reference in the record to heroin is inseparable from the overwhelming evidence of a conspiracy to distribute crack cocaine. Under these circumstances, we are confident that no miscarriage of justice will result, nor will the fairness or integrity of the proceedings be affected, from our declining to notice the error in sentencing. Bowens' sentence is therefore affirmed.

V.

For the reasons stated, we affirm Bowens' drug conspiracy conviction and his life sentence for conspiracy to distribute crack cocaine. We vacate Bowens' two convictions for harboring a fugitive.

AFFIRMED IN PART AND VACATED IN PART

20