[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 20-12667

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

TIMOTHY J. SMITH,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Florida
D.C. Docket No. 3:19-cr-00032-MCR-1

_____

Before WILLIAM PRYOR, Chief Judge, GRANT, and HULL, Circuit Judges.

WILLIAM PRYOR, Chief Judge:

This appeal concerns whether an accused can be tried in a venue where he did not commit any of the conduct elements of the charged crime. Timothy Smith is a software engineer and avid angler who obtained the coordinates of artificial fishing reefs in the Gulf of Mexico from a website owned by StrikeLines, a business that sells those coordinates. Smith remained in Mobile, Alabama, during the relevant events, but he was tried in the Northern District of Florida, where StrikeLines's office is located. The jury convicted Smith of two counts—one count of theft of trade secrets and one count of extortion—and the district court enhanced his sentence. We vacate Smith's conviction for theft of trade secrets and related sentencing enhancements for lack of venue, affirm the extortion conviction and related sentencing enhancements, and remand for resentencing.

## I. BACKGROUND

Tristan Harper and Travis Griggs own a business called StrikeLines. StrikeLines sells the coordinates of artificial reefs placed in various locations in the Gulf of Mexico by commercial and recreational fishermen. The reefs create attractive fishing locations, the coordinates of which are usually not shared to prevent overfishing. StrikeLines has its office in Pensacola, but the servers where its website and data are hosted are in Orlando.

20-12667                Opinion of the Court                3

StrikeLines obtains artificial-reef coordinates in two ways. First, StrikeLines harvests data from public records. About a quarter of the coordinates on StrikeLines's website come from public records, but Strikelines does not sell these coordinates. It offers the coordinates from public sources on its website for free. Second, StrikeLines obtains the coordinates for private reefs by launching boats equipped with sonar equipment from its base in Pensacola to trowel through the Gulf of Mexico and discover the reef locations. After processing the raw data collected by sonar, StrikeLines offers the private reef coordinates on its website, where each coordinate is sold only once, for between $190 and $199.

The defendant in this case, Timothy Smith, is a software engineer who lives in Mobile, Alabama. He fishes from 1,200 to 1,500 hours a year. He was prompted by a friend who is also an avid fisherman to look into StrikeLines, and he first visited the website in 2018.

When Smith visited the StrikeLines website, he used a web application called Fiddler, which allowed him to see the coordinates of private artificial reefs. Smith later accessed the coordinate data again after additional security measures had been installed.

Smith noticed a photograph of someone he knew on the StrikeLines website and contacted that acquaintance with the goal of being put into contact with the owners of StrikeLines. Smith succeeded, and a series of conversations between Smith and the owners of StrikeLines followed. Smith confirmed by telephone that he obtained the private reef coordinates that StrikeLines sells on its

website. Smith sent photographs of the data that he obtained to the owners of StrikeLines to confirm that he had accessed the reef co-ordinates. Smith refused to tell the owners of StrikeLines how he accessed the data.

After learning that someone had access to their business data, Griggs and Harper contacted their web developer, Ralph Haynes. Haynes has a degree in computer science and has worked in web development for more than ten years, but he had never seen anyone access data in the way depicted in the screenshots from Smith. And in response to Griggs and Harper sharing what Smith had sent them, Haynes added extra layers of security to the Strike-Lines website.

Shortly after Haynes upgraded StrikeLines's security, several customers of StrikeLines informed the owners that Smith had posted on Facebook that he possessed all of StrikeLines's coordinates. In one post, Smith said that he "would like to give anyone who has paid to have [artificial reefs put out the opportunity] to look and see what reefs [StrikeLines] has for sale or has sold in the past" and that "[s]everal of [his] friends [had] dozens . . . of [artificial reef locations that were] for sale or [that had] been sold by [Strike-Lines]." And he told viewers of the post to "direct message" him. This post was on Smith's personal page, and similar posts were in a couple of group pages for people interested in fishing.

Smith's posts and the customer complaints about them prompted Griggs to ask Smith by text message whether he could still access the data after Haynes upgraded the security. Smith

responded that he could still access the data. But Smith refused to tell Griggs how he could do so and said that what Haynes had done with the security was "enough to deter 99.9 percent of users." Smith then sent another picture of the artificial reef coordinates and internal data he accessed.

After communications about how the Facebook posts were "creating a lot of trouble" by "causing actual harm to [Strikelines's] reputation" and the owners' "livelihood," Smith told Griggs, "How about this, I'll delete the post, won't ever say anything else about it, even to those that have contacted me. I need help with one thing, though." Griggs replied, "What's that?" Smith said, "I need deep grouper numbers, div[e]able, 160 to 210. I'll also help you fix your problem free of charge. But me fixing your problem has to remain strictly between me and you, and I mean strictly." Griggs responded that if Smith deleted his Facebook posts that they might be able to talk about Smith's proposition. And Smith said, "I'll delete the post in good faith, but I'm not sure I'm really interested in side [coding] projects. I'm really just interested in deep grouper spots. I mean, I'll listen to what you've got, though. We have a deal?" Griggs and Smith exchanged more texts about the type of grouper spots that Smith wanted, and Griggs retired from the exchange for dinner.

The next day, communications broke down, apparently because Griggs did not provide Smith with deep grouper coordinates. And because he did not receive the deep grouper numbers, Smith told Griggs that the "[p]osts are going back up." Griggs attempted

to contact Smith again, but after it became clear that Smith would not cooperate, Griggs and Harper contacted law enforcement.

Officers executed a search warrant for Smith's home based on the StrikeLines website access logs evidencing that he had accessed the website over 4,500 times and Facebook records establishing that he sent pictures of the coordinates to his friends on Facebook Messenger. During the search, agents seized Smith's electronic equipment. And agents found StrikeLines's coordinates and other customer and sales data on Smith's devices.

During the search, an agent conducted an interview with Smith after advising him of his rights to remain silent and to counsel. *See Miranda v. Arizona*, 384 U.S. 436, 444 (1966). The agent testified that Smith said that he thought he knew "StrikeLines" was the reason why the agents were searching his home. Smith admitted that "he wrote a ten-line code to decrypt the information" from the StrikeLines website. Smith also admitted to the agent that he disagreed with StrikeLines's business, accessed the website after StrikeLines had its security upgraded, wrote the Facebook posts, sent the relevant messages, shared StrikeLines's coordinates, and "infiltrate[d]" the StrikeLines website.

A federal grand jury indicted Smith on three counts in the Northern District of Florida. The first count was a violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(2)(C), (c)(2)(B)(iii), for knowingly and intentionally accessing a computer without authorization and for obtaining information with a value exceeding $5,000 from a protected computer. The second count

was for theft of trade secrets. *See id.* § 1832(a)(1). The third count was for transmitting a threat through interstate commerce with intent to extort a thing of value. *See id.* § 875(d).

Before trial, Smith moved to dismiss all counts for lack of venue. In that motion, Smith stated that he was a resident of Mobile, which is in the Southern District of Alabama, and resided there during all the events relevant to the indictment. And he explained that, although StrikeLines was headquartered in Pensacola, which is in the Northern District of Florida, its servers, where the coordinate data was stored, were in Orlando, which is in the Middle District of Florida. He argued that venue was improper in the Northern District of Florida for the first two counts because all the prohibited conduct occurred in the Southern District of Alabama and the data that was accessed and obtained was in the Middle District of Florida. Smith also argued that "[b]ecause venue is not proper in the Northern District of Florida as to Counts One and Two, it would not be proper venue for Count Three."

The United States responded that the motion was premature. In the alternative, the government raised the possibility that the effects of the crime on the victims in the Northern District of Florida were relevant for venue purposes. And the government suggested that the "substantial contacts" test for venue adopted by some courts would be enough to provide venue in this case. The district court agreed with the government that the motion was premature and denied it without prejudice.

The defense renewed its motion challenging venue at trial and challenged the sufficiency of the evidence. Smith argued that venue was improper as to the first two counts because there was no evidence that any essential conduct element occurred in the Northern District of Florida. And Smith argued that the evidence was insufficient to support a conviction on all counts.

The government responded by arguing that the evidence was sufficient on all counts and that venue was proper. The government argued that venue was proper on counts one and two because the stolen data was produced in the Northern District of Florida and later transmitted to Orlando, so the government asserted that the data was actually obtained by Smith from Pensacola. The government also argued that the effects on StrikeLines in Pensacola were relevant to venue for the purposes of count two.

The district court denied Smith's motion as to count three, the extortion count, but reserved a ruling on the other two counts. The district court submitted the case to the jury with instructions that the government bore the burden of proving venue by a preponderance of evidence. The jury returned a verdict of not guilty as to count one and guilty as to counts two and three.

The district court ordered supplemental briefing on the issue of venue for the second count. The parties renewed their arguments about venue, and Smith renewed his argument that venue was improper as to count three because it was improper as to count two.

The district court denied the defense's motion on the ground that "the essential conduct of theft or misappropriation is necessarily defined in terms of its effects, i.e., the owner's loss of the trade secret," and "venue is proper . . . where the owner . . . feels the loss of its trade secret." The district court also rejected the argument that improper venue on count two rendered venue improper on count three. Smith filed a post-judgment motion for acquittal on sufficiency of evidence grounds, and the district court also denied that motion.

In a presentence investigation report, a probation officer grouped the offenses and determined the base offense level was six. The officer recommended a six-level enhancement for use of sophisticated means. And the officer calculated an offense level of 12 and a guideline range of 10 to 16 months.

Both parties objected to the report. The government argued for a twelve-level enhancement for the amount of loss, a two-level enhancement for use of special skill, and a two-level enhancement for obstruction of justice based on Smith's materially false testimony. Smith objected to the loss calculation, the sophisticated-means enhancement, the special-skill enhancement, and the absence of a two-level reduction for acceptance of responsibility. The probation officer issued a new report that added a recommendation of a two-level enhancement for use of a special skill. The officer then calculated an offense level of 14 and a guideline range of 15 to 21 months.

The district court sustained some of the government's objections and overruled all of Smith's objections. The district court calculated StrikeLines's loss differently from the probation officer or either of the parties and determined that the loss resulted in an eight-level increase. The district court agreed with the government that Smith's testimony that his exchanges with the owners of StrikeLines were "negotiations" and were intended to "help" the owners of the website was materially false because the exchanges amounted to extortion, and it applied an enhancement for obstruction of justice because the testimony was materially false. The district court also overruled Smith's objection to the lack of an acceptance of responsibility reduction. Finally, the district court overruled Smith's objections to the sophisticated means and special skill enhancements, on the grounds that the code Smith wrote to obtain the coordinates was sophisticated and that he used special skills as a software engineer, and it rejected an argument that applying both was "double counting." The final offense level was 20 with a guideline range of 33 to 41 months. The district court departed downward and imposed a sentence of 18 months and one year of supervised release.

## II. STANDARDS OF REVIEW

We review *de novo* a determination that the government established venue by a preponderance of the evidence. *United States v. Bradley*, 644 F.3d 1213, 1251 (11th Cir. 2011). We view evidence related to venue in the light most favorable to the government and make all reasonable inferences and credibility

determinations in favor of the verdict the jury returned. *Id.* We also review challenges to the sufficiency of evidence *de novo*, view the evidence in the light most favorable to the government, and draw all reasonable inferences and credibility determinations in favor or the verdict. *United States v. Wilson*, 788 F.3d 1298, 1308 (11th Cir. 2015). A jury's verdict cannot be overturned for insufficient evidence unless there is no reasonable construction of the evidence that could support a guilty verdict. *Id.* We review the district court's findings of fact at sentencing for clear error, but we review applications of the Sentencing Guidelines to those facts *de novo*. *United States v. Bradberry*, 466 F.3d 1249, 1253 (11th Cir. 2006). Denials of a sentencing reduction for acceptance of responsibility—findings entitled to "great deference"—are reviewed for clear error. *United States v. Knight*, 562 F.3d 1314, 1322 (11th Cir. 2009) (internal quotation marks omitted).

## III. DISCUSSION

We divide our discussion in three parts. First, we discuss why venue was improper for the theft-of-trade-secrets count and why that count must be vacated, and we explain that improper venue for that count does not require vacatur of the conviction for extortion. Second, we explain that there was sufficient evidence for a conviction on the extortion count. Third, we address the sentencing issues.

### A. Venue Was Improper for the Theft-of-Trade-Secrets Count, But Proper for the Extortion Count

"The Constitution, the Sixth Amendment, and Rule 18 of the Federal Rules of Criminal Procedure guarantee defendants the right to be tried in the district in which the crime was committed." *United States v. Little*, 864 F.3d 1283, 1287 (11th Cir. 2017) (internal quotation marks omitted); *see also* U.S. CONST. art. III, § 2, cl.3; *id.* amend. VI; FED. R. CRIM. P. 18. Venue must be proved by a preponderance of the evidence. *Little*, 864 F.3d at 1287. Venue is proper at the *locus delicti*, which is determined by "the nature of the crime alleged and the location of the act or acts constituting it." *United States v. Rodriguez-Moreno*, 526 U.S. 275, 279 (1999) (internal quotation marks omitted); *accord United States v. Cabrales*, 524 U.S. 1, 6–7 (1998). "In performing this inquiry, a court must initially identify the conduct constituting the offense (the nature of the crime) and then discern the location of the commission of the criminal acts." *Rodriguez-Moreno*, 526 U.S. at 279.

Based on *United States v. Rodriguez-Moreno*, we perform a two-step venue inquiry. *Id.* First, we identify the essential conduct elements of the theft-of-trade-secrets count. *See United States v. Bowens*, 224 F.3d 302, 311 (4th Cir. 2000). Then, we "discern the location of the commission" of the essential conduct elements, which are the only relevant elements for venue, and determine whether the location of their commission is the same as the location of the trial. *See Rodriguez-Moreno*, 526 U.S. at 279. Here, they are not.

Theft of trade secrets consists of five elements: first, the defendant must intend to convert proprietary information to the economic benefit of anyone other than the owner; second, the proprietary information must be a trade secret; third, the defendant must knowingly steal, take without authorization, or obtain by fraud or deception trade secret information; fourth, the defendant must intend or know that the offense would injure the owner of the trade secret; and finally, the trade secret must be related to a product that is in interstate or foreign commerce. *See* 18 U.S.C. § 1832(a). The first and fourth elements are mens rea elements irrelevant to venue. *See Rodriguez-Moreno*, 526 U.S. at 279. The second and final elements are not elements of the defendant's conduct. *See id.* at 280 n.4. The essential conduct element of the crime is that the defendant must steal, take without authorization, or obtain by fraud or deception trade-secret information, *see* 18 U.S.C. § 1832(a), so that conduct must have taken place in the same location as the trial. *See Rodriguez-Moreno*, 526 U.S. at 279; *Cabrales*, 524 U.S. at 6–7; *Bowens*, 224 F.3d at 311–12.

Smith was prosecuted for theft of trade secrets in the Northern District of Florida, but the parties agree that Smith remained in Mobile, which is in the Southern District of Alabama, during the commission of the crime. The parties also agree that the data was taken from servers located in the Middle District of Florida.

Although we need not decide whether venue would be proper in the Middle District of Florida, we can say that venue would be proper in the Southern District of Alabama, where Smith

was located when he took the trade secrets. But venue was not proper in the Northern District of Florida because Smith never committed any essential conduct in that location. *See Rodriguez-Moreno*, 526 U.S. at 279; *Cabrales*, 524 U.S. at 6–7.

The government argues that the effects of a crime are a permissible basis for venue. It relies on two pre-*Rodriguez-Moreno* decisions of this Court that considered the location of the effects of a crime in a venue analysis, and it relies on Hobbs Act prosecutions from other circuits, which likewise considered the location of the effects of the crime.

Our precedents are distinguishable. They involve a failure to pay child support, *United States v. Muench*, 153 F.3d 1298, 1300 (11th Cir. 1998), and obstruction of justice, *United States v. Barham*, 666 F.2d 521, 523 (11th Cir. 1982). Both of those offenses contained an essential element of the crime that we understood to be defined in terms of the effects of the act. *Barham*, 666 F.2d at 524 (holding that the location of the effects of the crime is proper venue because "[t]he very nature of the crime is affecting, or endeavoring to affect, the due administration of justice; the activities prohibited under the statute are those intended to influence the administration of justice where the affected judicial proceeding is being held or has been held" (internal quotation marks omitted)); *see also Muench*, 153 F.3d at 1304 (holding that venue was proper in a district where the effects of a violation of the Child Support Recovery Act were felt because the "offense . . . was completed when [the

20-12667                Opinion of the Court                15

defendant's] children in [that district] failed to receive their past due support").

The Hobbs Act prosecutions are also distinguishable. As one of our sister circuits explained, although the decisions in *Rodriguez-Moreno* and *United States v. Cabrales* "require us to determine venue solely by reference to the essential conduct elements of the crime," those decisions "have [not] altered the well-established rule that Congress may, consistent with [the Constitution], define the essential conduct elements of a criminal offense in terms of their effects, thus providing venue where those effects are felt." *Bowens*, 224 F.3d at 311, 312. For the Hobbs Act, Congress defined the essential conduct element in terms of its effects on commerce. 18 U.S.C. § 1951; *Bowens*, 224 F.3d at 313 (citing the Hobbs Act as a statute that defines an essential conduct element in terms of its effects); *see also United States v. Auernheimer*, 748 F.3d 525, 537 (3d Cir. 2014) ("[I]n a prosecution for Hobbs Act robbery, venue may be proper in any district where commerce is affected because the terms of the act themselves forbid affecting commerce."); *cf. Barham*, 666 F.2d at 524 (holding that venue was proper in an obstruction of justice prosecution where justice was obstructed because "the activities prohibited under the statute are those intended to influence the administration of justice where the affected judicial proceeding is being held or has been held" (internal quotation marks omitted)).

The theft-of-trade-secrets statute does not define any essential conduct element of the offense in terms of its effects on the

owner of the trade secret. As Smith correctly argues, "[a] plain reading of the statute reveals that there is no requirement" that "the owner of the trade secret realize[] a loss." *See* 18 U.S.C. § 1832(a)(1). The government responds that inherent in a theft is interference with the possessory interest of the owner, and so the essential conduct element is defined in terms of its effects. But the mere presence of an implied victim of a theft does not create an inference that Congress "define[d] the essential conduct element[] . . . in terms of [its] effects." *See Bowens*, 224 F.3d at 311 n.4, 313.

The government also argues that it is permitted to prosecute an offense "involving . . . transportation in interstate or foreign commerce . . . in any district from, through, or into which such commerce . . . moves." 18 U.S.C. § 3237(a). But the government does not dispute that when Smith took the coordinates from the servers in Orlando he received possession of them in Mobile. The government points to no evidence that the trade secrets were taken from or transported through the Northern District of Florida, and the government offers no authority for the idea that the location where the trade secrets were created is relevant to venue under section 3237(a).

Venue was improper in the Northern District of Florida. The remedy for improper venue is vacatur of the conviction, not acquittal or dismissal with prejudice. *See, e.g.*, *United States v. Davis*, 666 F.2d 195, 202 (5th Cir. Unit B 1982). The Double Jeopardy clause is not implicated by a retrial in a proper venue after we vacate a conviction for improper venue. *Haney v. Burgess*, 799 F.2d

661, 664 (11th Cir. 1986). Because we vacate Smith's conviction on count two for lack of venue, we express no opinion on whether there was sufficient evidence to support the conviction. *See Davis*, 666 F.2d at 201.

Smith argues that lack of proper venue on the theft-of-trade-secrets count is a structural error that requires his extortion conviction to be vacated, but we disagree. The only decision cited by Smith that addresses the effect of finding improper venue for one count on another count is *United States v. Schlei*, 122 F.3d 944 (11th Cir. 1997). And that decision supports the opposite conclusion that Smith urges us to reach. In *Schlei*, we vacated a conviction on one count because the indictment on that count alleged two separate criminal transactions, one of which was tried in an improper venue, a fact undisputed by the parties. *Id.* at 977, 979–80. Despite vacating a conviction due to lack of venue on one count, we said that the district court could reenter a judgment of conviction on a separate count that was vacated on other grounds. *Id.* at 997. Indeed, our precedent allows vacatur of a conviction on one count due to improper venue and affirmance of a conviction on another count. *See Davis*, 666 F.2d at 202.

## B. The Evidence Is Sufficient to Support the Extortion Conviction.

Smith also challenges the sufficiency of the evidence to sustain his conviction for extortion. A jury's verdict cannot be overturned for insufficient evidence unless there is *no* reasonable

construction of the evidence that could support a guilty verdict. *Wilson*, 788 F.3d at 1308. Smith cannot satisfy that burden.

The jury had sufficient evidence to support the guilty verdict based on the Facebook posts and the text messages that Smith exchanged with Griggs. In those text messages, Griggs told Smith that his Facebook posts regarding the StrikeLines coordinates were "creating a lot of trouble" and "causing actual harm to [his] reputation and . . . livelihood." In response, Smith said that he would take down the posts and then asked for deep grouper numbers. And when he did not receive deep grouper numbers the next day, Smith said the "[p]osts [were] going back up." The jury was entitled to construe this evidence as supporting a conviction because deep grouper numbers are "thing[s] of value." *See* 18 U.S.C. § 875(d). Smith's text that the "[p]osts," which he knew "caus[ed] actual harm to [Griggs's] reputation and . . . livelihood," were "going back up" was "transmit[ted] in interstate . . . commerce" and can be construed as a threat to "injure the . . . reputation" of Griggs "with intent to extort" from Griggs the grouper numbers. *See id.*

## C. The Sentencing Enhancements Related to Count Two Must Be Vacated, but the District Court Did Not Err in Applying the Obstruction-of-Justice Enhancement or Denying the Reduction for Acceptance of Guilt.

Finally, Smith challenges all his sentencing enhancements and the denial of a reduction for acceptance of guilt. Because the district court based its calculation of loss enhancement on the loss caused by the now-vacated conviction for theft of trade secrets, we

vacate that enhancement. We likewise vacate the enhancements imposed by the district court for use of sophisticated means and special skill because both of those enhancements were based on how Smith committed the now-vacated theft-of-trade-secrets offense.

Smith's argument that he should not have received the enhancement for obstruction of justice fails. The district court found that Smith gave false testimony. That finding was not clearly erroneous because it was supported by Smith's testimony that his exchanges with Griggs were a "negotiation" and not extortion. *See, e.g.*, *United States v. Singh*, 291 F.3d 756, 763 (11th Cir. 2002) (explaining that the district court is "accord[ed] great deference" on obstruction-of-justice enhancement determinations (internal quotation marks omitted)). And "false testimony concerning a material matter with the willful intent to provide false testimony" is sufficient to support an obstruction-of-justice enhancement. *United States v. Duperval*, 777 F.3d 1324, 1337 (11th Cir. 2015) (internal quotation marks omitted).

Smith's argument that his sentence should have been reduced for acceptance of responsibility also fails. Smith does not make any affirmative argument that he accepted responsibility for his crime either before this Court or the district court. Denials of a sentencing reduction for acceptance of responsibility are findings reviewed for clear error and entitled to "great deference." *Knight*, 562 F.3d at 1322 (internal quotation marks omitted). The finding that Smith never accepted responsibility for the extortion count

was not clearly erroneous. We affirm both the denial of an acceptance of responsibility reduction and the enhancement for obstruction of justice, and we remand to the district court for resentencing only on count three.

## IV. CONCLUSION

We **VACATE** Smith's conviction on count two and his sentence enhancements for sophisticated means, special skills, and calculated loss. We **AFFIRM** Smith's conviction on count three, the sentence enhancement for obstruction of justice, and the denial of a sentence reduction for acceptance of responsibility. And we **REMAND** for resentencing based only on count three.