**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

OCEANPRO INDUSTRIES, LTD., d/b/a
Profish, Ltd.,

*Defendant-Appellant.*

⎬ No. 10-5239

─────────────────

STATE OF MARYLAND,

*Amicus Supporting Appellee.*

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

BENJAMIN PAUL CLOUGH, III,

*Defendant-Appellant.*

⎬ No. 10-5284

─────────────────

STATE OF MARYLAND,

*Amicus Supporting Appellee.*

UNITED STATES OF AMERICA,

　　　　　　*Plaintiff-Appellee,*

　　　　v.

TIMOTHY JOHN LYDON,

　　　　　　*Defendant-Appellant.*

STATE OF MARYLAND,

　　　*Amicus Supporting Appellee.*

No. 10-5285

Appeals from the United States District Court
for the District of Maryland, at Greenbelt.
Peter J. Messitte, Senior District Judge.
(8:09-cr-00634-PJM-1; 8:09-cr-00634-PJM-3;
8:09-cr-00634-PJM-2)

Argued: December 9, 2011

Decided: March 23, 2012

Before NIEMEYER, KING, and DUNCAN, Circuit Judges.

Affirmed by published opinion. Judge Niemeyer wrote the
opinion, in which Judge King and Judge Duncan joined.

## COUNSEL

**ARGUED:** Daniel Saleem Seikaly, Sr., ANDREWS &
KURTH, LLP, Washington, D.C.; Richard Wyrough, Wal-
dorf, Maryland, for Appellants. John Luther Smeltzer,

UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Robert Dreher, Acting Assistant Attorney General, Wayne D. Hettenbach, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. Douglas F. Gansler, Attorney General, Baltimore, Maryland, Paul J. Cucuzzella, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL, Annapolis, Maryland, for Amicus Supporting Appellee.

## OPINION

NIEMEYER, Circuit Judge:

Oceanpro Industries, Ltd., doing business as "Profish, Ltd." ("Oceanpro"), a seafood wholesaler in the District of Columbia, and two Oceanpro employees, Timothy Lydon (officer and fish buyer) and Benjamin Clough, III (fish buyer), were convicted for purchasing untagged and oversized striped bass, in violation of the Lacey Act, 16 U.S.C. § 3372(a)(2)(A) (prohibiting the purchase in interstate commerce of fish or wildlife sold in violation of state law). Oceanpro and Clough were also convicted for giving a false statement to federal law enforcement officers during the course of the investigation of the crimes, in violation of 18 U.S.C. § 1001. In addition to imposing fines and prison sentences, the district court ordered the three defendants, jointly and severally, to pay Maryland and Virginia $300,000 in restitution, to be divided equally between the States.

On appeal, Oceanpro and Clough challenge the District of Maryland's venue for the false statement offense because the false statement was made at the offices of Oceanpro in the District of Columbia, not in Maryland. In addition, all of the defendants contend that the order of restitution to the States was improper because the States did not have a sufficient interest in the illegally caught fish so as to make them "vic-

tims," as is required for receiving the benefit of a restitution order.

We reject both arguments, concluding that venue for the false statement charge was proper in the District of Maryland and that Maryland and Virginia's interest in striped bass was sufficient to make the States "victims" and therefore to justify an award to them of restitution. Accordingly, we affirm.

I

Oceanpro is a seafood wholesaler operating in the District of Columbia. Timothy Lydon was part owner and vice-president of Oceanpro, and Benjamin Clough was an employee during the period from 2001 through 2007. Both were responsible for purchasing striped bass from commercial fishermen for Oceanpro's resale to restaurants and other customers.

The striped bass, commonly called "rockfish," is a highly prized fish for both eating and sport fishing. It is regulated in the main stem of the Potomac River by the Potomac River Fish Commission (comprised of commissioners from both Maryland and Virginia) and in the other waters of Maryland and Virginia by the States, respectively. During the 1980s, when the stock of striped bass was depleted, all harvesting of the fish was prohibited. But beginning in 1995, when the stock had been restored, commercial fishing for striped bass was reopened, subject to restrictions consisting of seasonal closures, size limits, and harvest quotas. To protect spawning fish, Maryland prohibited the harvesting of striped bass between March 25 and June 1, and Virginia restricted harvesting during the same period to fish between 18 and 28 inches in size. Also, both States imposed annual catch quotas, which were enforced by the requirement to tag all fish.

Following an investigation into the illegal harvesting of striped bass, Oceanpro, Lydon, and Clough were indicted in

four counts, charging in Count One, conspiracy to violate the Lacey Act, and in Counts Two, Three, and Four, the substantive acts of purchasing untagged and oversized fish during specified periods. Oceanpro and Clough were charged in Count Five for making the following false statement, which was signed and under oath, to investigators: "During my employment with Oceanpro, I have never purchased untagged striped bass from Jerry Decatur [,Sr.] or Jerry Decatur, Jr." The indictment alleged that Oceanpro and Clough had in fact knowingly purchased untagged striped bass from the Decaturs on numerous occasions.

Before trial, Oceanpro and Clough unsuccessfully challenged the venue of the false statement count on the ground that the false statement was made at Oceanpro's offices in the District of Columbia, and not in Maryland where Oceanpro and Clough were indicted.

A jury convicted all three defendants on all counts charged. With respect to Counts Two through Four, the jury convicted Clough for lesser included offenses based on his lesser involvement. The government established during trial that during the period from 1995 to May 2007, Oceanpro purchased 213,703 pounds of striped bass that were illegally harvested in Maryland and Virginia. While Lydon was involved in buying striped bass during the entire period, Clough was a buyer for Oceanpro only between 2001 and 2007, and during that period, Oceanpro purchased 157,361 pounds of illegally harvested striped bass. Based on a market value of four dollars per pound, the government calculated that Oceanpro and Lydon were responsible for purchasing $854,812 worth of illegally caught striped bass and Clough, for $629,444 worth.

The district court sentenced Oceanpro to a fine of $575,000, and Lydon and Clough to terms of imprisonment of 21 months and 15 months, respectively. Additionally, the court imposed a $60,000 fine on Lydon and a $7,500 fine on Clough. Finally, the court ordered that all three defendants,

jointly and severally, pay $300,000 in restitution to Maryland and Virginia, to be divided equally between the States. Compliance with the restitution order was also made a condition of probation for Oceanpro and a condition of supervised release for the two individuals.

From judgments entered on November 30, 2010, the defendants appealed. Oceanpro and Clough challenge the venue of the false statement charge in Count Five, and all three defendants challenge the restitution order.

## II.    Venue

Federal law enforcement officers visited Oceanpro's place of business on Fenwick Street in Washington, D.C., on August 29, 2007, to execute a search warrant and serve a grand jury subpoena in connection with their investigation of trafficking in illegally caught striped bass. They also interviewed Clough, who gave a signed statement under oath, which included: "During my employment with OceanPro, I have never purchased untagged striped bass from Jerry Decatur [,Sr.] or Jerry Decatur, Jr." As found by the jury, this statement was false and Clough knew it. The evidence showed that Clough, acting on behalf of Oceanpro, purchased untagged striped bass that were harvested in the Potomac River in Maryland from the Decaturs on numerous occasions. These facts formed the basis for the jury's conviction of Oceanpro and Clough on Count Five for violation of 18 U.S.C. § 1001.

Oceanpro and Clough contend that because Clough's statement was made in Oceanpro's offices in the District of Columbia, the crime was committed entirely in the District of Columbia, and therefore venue for the crime was inappropriate in the District of Maryland. They rely on the Supreme Court's statement in *United States v. Cabrales*, 524 U.S. 1, 6-7 (1998), that for purposes of determining venue, "[t]he *locus delicti* must be determined from the nature of the crime alleged and the location of the act or acts constituting it."

Relying on *United States v. Bowens*, 224 F.3d 302, 314 (4th Cir. 2000), the government contends that venue is also proper in Maryland because the *effects* of the false statement, based on the materiality requirement, were essential to the offense and were felt in Maryland by the Maryland-based investigation.

Proper venue is, of course, a constitutional right. Article III requires that "[t]he Trial of all Crimes . . . shall be held in the State where the said Crimes shall have been committed," U.S. Const. art. III, § 2, cl. 3, and the Sixth Amendment reinforces this command by mandating that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed," U.S. Const. amend. VI. These constitutional mandates are codified in Federal Rule of Criminal Procedure 18, which provides that "the government must prosecute an offense in a district where the offense was committed." *See also United States v. Rodriguez-Moreno*, 526 U.S. 275, 278 (1999).

When a criminal statute does not contain an express venue provision, the place of the crime, its *locus delicti*, controls venue, and the place of the crime "must be determined from the nature of the crime alleged and the location of the act or acts constituting it." *Cabrales*, 524 U.S. at 6-7. The Supreme Court has set forth a two-part test for making this determination: "In performing this inquiry, a court must initially identify the conduct constituting the offense (the nature of the crime) and then discern the location of the commission of the criminal acts." *Rodriguez-Moreno*, 526 U.S. at 279.

We interpreted *Rodgriguez-Moreno* in *Bowens*, refining its rubrics by holding that the "circumstance" elements of an offense, even if essential, are of "no moment" to a venue determination. "[T]he place where a criminal offense is committed is determined solely by the *essential conduct elements* of that offense." *Bowens*, 224 F.3d at 310-11 (emphasis

added). But *Bowens* recognized that Congress had the power to "define the essential conduct elements of a criminal offense in terms of *their effects*, thus providing venue *where those effects are felt*." *Id.* at 312 (emphasis added).

Accordingly, we begin the analysis by turning to 18 U.S.C. § 1001 to determine what are the crime's "essential conduct elements." Section 1001 punishes "whoever, in any matter within the jurisdiction of the executive . . . branch of the [United States], knowingly and willfully . . . makes any materially false, fictitious, or fraudulent statement or representation." A conviction under § 1001 thus requires that the government prove (1) that a defendant made a "materially false . . . statement," (2) that the statement was made "in [a] matter within the jurisdiction" of the United States, and (3) that the statement was made "knowingly and willfully."

In reviewing the statutory elements of § 1001, the Supreme Court has noted that the requirement that the statement be "in any matter within the jurisdiction" of a federal agency is "jurisdictional language [that] appears in a phrase separate from the prohibited conduct" and is simply a "predicate circumstance" of the prohibited conduct. *United States v. Yermian*, 468 U.S. 63, 69 (1984). Similarly, the *mens rea* requirement would be a circumstance element that does not contribute to determining the *locus delicti* of the crime. *See Bowens*, 224 F.3d at 313. Thus, the essential conduct prohibited by the statute is "making any materially false statement."

While Oceanpro and Clough recognize that venue is appropriate where "*the effects* of the defendant's conduct are felt . . . when Congress has defined the essential conduct elements in terms of those effects," *Bowens*, 224 F.3d at 314 (emphasis added), they argue that the requirement that a false statement be material is merely a circumstance of the offense, not an effect of conduct sufficient to indicate venue.

But in making their argument that materiality is not relevant to venue for a § 1001 offense, Oceanpro and Clough

have interpreted our case law too narrowly. *Bowens* recognized that when statutory language merely "defines the requisite intent for an offense," or makes an offense dependent on proof of an antecedent crime, that language will not support venue. *Bowens*, 224 F.3d at 313. But where, as here, the essential conduct constituting the offense inherently references the effects of that conduct, "venue is proper in the district where those prescribed effects would be felt":

> [I]n a prosecution under the Hobbs Act, venue is proper in any district where commerce is affected because the terms of the statute itself forbid affecting commerce in particular ways. Similarly, a former version of 18 U.S.C. § 1503 prohibited influencing, intimidating, or impeding a witness or influencing, obstructing, or impeding the administration of justice. Because the essential conduct elements were defined not just in terms of the forbidden act, i.e., "assault" or "retaliate," but rather in terms of their effects (intimidation of a witness or obstruction of the administration of justice), venue was proper in the district where those proscribed effects would be felt.

*Id.* (citations omitted).

Thus, just as Congress defined the effects of conduct in the Hobbs Act and 18 U.S.C. § 1503, it defined the effects in § 1001 to include the element of materiality. And in this case, proving materiality necessarily requires evidence of the existence of the federal investigation in Maryland and the potential effects of Clough's statement on that investigation. *See United States v. Garcia-Ochoa*, 607 F.3d 371, 375 (4th Cir. 2010) ("The test of materiality is whether the false statement has a natural tendency to *influence* agency action or is capable of *influencing* agency action" (emphasis added)). Accordingly, we conclude that the District of Maryland had a substantial connection to Clough's conduct and to the charges

based on that conduct against him and Oceanpro. *See United States v. Ringer*, 300 F.3d 788, 792 (7th Cir. 2002) ("Since the halting of the investigation against Ringers' friends in the Southern District of Indiana was evidence of the materiality of Ringer's statements, venue was proper in the Southern District of Indiana"); *United States v. Salinas*, 373 F.3d 161, 167 (1st Cir. 2004) ("When materiality is a critical component of the statutory definition, it makes perfect sense to consider the crime as continuing into the district in which the effects of the false statement are felt"); *but see United States v. Smith*, 641 F.3d 1200, 1208 (10th Cir. 2011) (finding venue only where false statement was made).

For these reasons, we hold that venue for the § 1001 charge was proper in the District of Maryland.

## III.   Restitution

At sentencing, the district court ordered the defendants, jointly and severally, to pay $300,000 in restitution to the States of Maryland and Virginia as compensation for the striped bass that had been illegally harvested from their waters and sold to Oceanpro during the conspiracy. This amount was below the stipulated market value of the fish illegally caught and sold—$854,812 with respect to Oceanpro and Lydon, and $629,445 with respect to Clough. While the court did not cite authority for awarding restitution, it did order the defendants to pay restitution jointly and severally, and it also made compliance with its restitution order a condition of probation for Oceanpro and of supervised release for Lydon and Clough.

Oceanpro, Lydon, and Clough contend that the district court lacked authority to order any restitution because there was no "victim" in this case entitled to restitution under the Mandatory Victims' Restitution Act of 1996 ("MVRA"), 18 U.S.C. § 3663A. They argue specifically that Maryland and Virginia were not victims under the MVRA because the

States' interests in the striped bass within their waters was regulatory rather than proprietary, and the MVRA requires restitution, as relevant here, for convictions on offenses against a victim's property. 18 U.S.C. § 3663A(c)(1)(A)(ii).

The government contends that regardless of whether the States had a proprietary interest in the illegally caught striped bass, restitution was nonetheless authorized by other statutes. It argues that the States were "victims" under the Victim Witness Protection Act of 1982 ("VWPA"), 18 U.S.C. § 3663(a)(2), because their interests in the striped bass were "harmed," and therefore they were entitled to restitution under that Act. It also argues that the States were properly awarded restitution as a condition of probation and supervised release under 18 U.S.C. §§ 3563(b)(2) and 3583(d), because they were also "victims" under those statutes. Even under the MVRA, the government contends that the States were "victims" because, it argues, they obtained a proprietary interest in the illegally caught striped bass by reason of the States' forfeiture laws.

The State of Maryland, as an amicus supporting the government's position, asserts that it is a "victim" for purposes of restitution under both the MVRA by virtue of its *property interest* in illegally caught striped bass and the VWPA by virtue of the *harm* to its interests as trustee of the striped bass within its waters.

Although the defendants devoted almost their entire argument to whether the States have a *proprietary* interest in the striped bass while swimming freely in the waters of Maryland and Virginia, they did not respond to the government's reliance on the VWPA and the statutory provisions authorizing restitution as a condition of probation or supervised release. Those provisions authorize restitution to "victims" of crime in Title 18 and other specified crimes, each defining "victim" slightly differently.

The VWPA defines victim as a person "directly and proximately *harmed* as a result of the commission of an offense for which restitution may be ordered." *See* 18 U.S.C. § 3663(a)(2) (emphasis added). This is a broad definition, requiring the victim to have some interest that was "harmed." Even if Maryland and Virginia did not have a property interest in the striped bass, they surely did possess a legitimate and substantial interest in protecting the fish in their waters as part of the natural resources of the State and its fishing industries. And these interests were undoubtedly "directly and proximately *harmed*" as a result of the illegal harvesting of the striped bass. *See United States v. Gibbens*, 25 F.3d 28, 32 (1st Cir. 1994) ("[A] government entity (local, state or federal) may be a 'victim' for purposes of the VWPA (and may be awarded restitution) when it has passively suffered harm resulting directly from the defendant's criminal conduct"). Nothing in the VWPA precludes a court from ordering restitution to compensate States for the type of harm suffered here.

The analysis for ordering restitution as a condition of probation and supervised release is similar. To award restitution to Maryland or Virginia as a condition of probation, the States must be considered "victims" within the meaning of 18 U.S.C. § 3563(b)(2). But that section specifically indicates that the restitution to a "victim of the offense" for purposes of probation is "not subject to the limitation of" the VWPA, indicating that the definition of "victim" in this context is even *broader* than the definition of "victim" under the VWPA. The district court's restitution order was therefore appropriate on this basis alone. *See United States v. Batson*, 608 F.3d 630, 636 (9th Cir. 2010) ("[A] district court is . . . authorized by § 3563(b)(2) to order restitution as a condition of probation to the victim of any criminal offense . . . for which probation is properly imposed"). And the same analysis applies for ordering restitution as a condition of supervised release. *See* 18 U.S.C. § 3583(d) (adopting by reference 18 U.S.C. § 3563(b)(2) to govern the ordering of restitution as a condition of supervised release). *See Batson*, 608 F.3d at 633.

Finally, even under the MVRA, which requires that the States have a proprietary interest in the fish, the States were entitled to restitution, not based on the States' interests in the free swimming fish in their waters, but based on their proprietary interest in *illegally caught* fish obtained through the States' forfeiture laws.

The MVRA, when applicable, *mandates* that a sentencing court order restitution. *See* 18 U.S.C. §§ 3663A(a)(1), 3556. By its terms, the MVRA provides, as relevant here, that it applies in sentencings for convictions on any "offense against property," requiring the restitution order to require the return of the property to its owner or, if that is "impossible, impractical, or inadequate," the payment to the owner of an amount equal to the "value of the property." *Id.* § 3663A(b)(1).

Relying on *United States v. Bengis*, 631 F.3d 33 (2d Cir. 2011), the government contends that Maryland and Virginia obtained a proprietary interest in the striped bass at the moment they were illegally caught for later sale to Oceanpro because at that moment, they were, under state law, forfeited to the States. In *Bengis*, the court concluded that restitution for illegally harvested lobsters was mandated under the MVRA because, under South African law, illegally harvested lobsters were forfeited to the state. *Id.* at 39-42. As the Second Circuit explained, the moment the fishermen illegally harvested a lobster, the ownership of that lobster vested with the state because "lobsters possessed in violation of the regulatory scheme [did] not become property of the possessors[;] rather they [were] subject to seizure and sale by the government of South Africa." *Id.* at 39. "Evading seizure of overharvested lobsters thus deprive[d] South Africa of an opportunity to sell those illegally captured lobsters at market price and retain the proceeds, representing an economic loss to South Africa each time an illegally harvested lobster [went] unseized." *Id.* The government in this case argues that the same reasons apply here. Just as South African law authorized the seizure and sale of the illegally harvested lobsters, Maryland and Virginia law

authorize the States' seizure and sale of illegally harvested striped bass. *See* Md. Code Ann., Nat. Res. § 4-1205; Va. Code Ann. § 28.2-900; 4 Va. Admin. Code 20-252-160.I.

The defendants argue that the situation here is different from that in *Bengis* because the Lacey Act has its own forfeiture provisions for the illegal harvesting of fish, providing for the forfeiture to the United States of the fish. It argues that the United States' rights to the fish flow from its *regulatory* interests, not its *proprietary* interests. For the same reason, they argue that the States' rights in forfeiture result from the States' regulatory interests, not their proprietary interests.

The defendants' argument, however, fails to distinguish *Bengis*, which was also brought under the Lacey Act. Moreover, their argument fails to address the logic of *Bengis*. In *Bengis*, the Second Circuit recognized a proprietary interest in the lobsters *only after* the lobsters were caught in violation of state laws. The circumstances here are identical. In both cases, the criminal actions were brought under the Lacey Act and both involved the illegal catch of fish (lobsters in *Bengis* and striped bass here), which became subject to seizure and sale by the state.

Finding *Bengis* persuasive, we conclude that Maryland and Virginia also had a proprietary interest in the illegally harvested striped bass after they were caught, so as to entitle them to restitution under the MVRA. *Cf. United States v. Newsome*, 322 F.3d 328, 340-42 (4th Cir. 2003) (finding the federal government to be a victim under the MVRA and ordering restitution for illegally harvesting black cherry trees in a national forest).

In conclusion, we hold that the restitution award in this case was proper under any of the restitution provisions advanced—the MVRA, the VWPA, and as a condition of probation and supervised release—because, under the applicable statutory provisions, the district court was authorized to

require the defendants to make restitution to "*victims*." To qualify as victims, Maryland and Virginia need not even have been "owners" of the striped bass, although they were after the fish were illegally caught; they merely had to have interests that were "harmed" as a result of the defendants' criminal conduct. Because we have concluded that their interests were indeed harmed, the States were victims and therefore properly awarded restitution.

*AFFIRMED*