**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

No. 11-4951

LARRY L. DEFFENBAUGH,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Virginia, at Norfolk.
Henry Coke Morgan, Jr., Senior District Judge.
(2:10-cr-00049-HCM-TEM-1)

Argued: December 7, 2012

Decided: February 28, 2013

Before NIEMEYER, KING, and FLOYD, Circuit Judges.

Affirmed by published opinion. Judge Niemeyer wrote the opinion, in which Judge King and Judge Floyd joined.

**COUNSEL**

**ARGUED:** Patrick L. Bryant, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Alexandria, Virginia, for Appellant. Joseph Kosky, OFFICE OF THE UNITED STATES ATTORNEY, Norfolk, Virginia, for Appellee. **ON BRIEF:** Michael S. Nachmanoff, Federal Public Defender, Alexan-

dria, Virginia, Keith Loren Kimball, Assistant Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Norfolk, Virginia, for Appellant. Neil H. Mac-Bride, United States Attorney, Alexandria, Virginia, for Appellee.

---

**OPINION**

NIEMEYER, Circuit Judge:

In order to avoid a state probation violation hearing, Larry Deffenbaugh designed a plan to fake his death with the assistance of his girlfriend. Under the scheme, Deffenbaugh would rent a boat to go fishing with his unsuspecting brother and, while his brother was preoccupied with driving the boat, he would jump off, swim to shore, meet up with his girlfriend, and flee the State. He expected that when his brother discovered his absence, his brother would make a distress call; that the U.S. Coast Guard would respond and conduct an unsuccessful search; and that he would be declared dead after a period of time.

It all happened as planned, except that Deffenbaugh was not declared dead. He was arrested in Texas and indicted and convicted in Virginia of conspiring with his girlfriend to cause a false distress call to be communicated to the U.S. Coast Guard, in violation of 18 U.S.C. § 371, and the substantive offense of causing a false distress call to be sent to the U.S. Coast Guard, in violation of 14 U.S.C. § 88(c). The district court sentenced him to 48 months' imprisonment on the conspiracy count and 36 months' imprisonment on the substantive count, to be served consecutively.

On appeal, Deffenbaugh contends that the government failed to prove a conspiracy because his girlfriend did not share in the object of the conspiracy to commit a *federal*

offense, as she was not aware and therefore could not intend that the false distress call would go to the U.S. Coast Guard. He also challenges the reasonableness of his sentence.

We affirm. Although the government did not prove that Deffenbaugh's girlfriend was aware and therefore intended that the U.S. Coast Guard would respond to the false distress call, it proved that she knew of and participated in the plan and that, under the plan, a false distress call would be made. With this proof and proof that the U.S. Coast Guard received the call, the government established a conspiracy to violate 14 U.S.C. § 88(c), regardless of whether the conspirators knew or intended that the Coast Guard would receive the call.

We also conclude that Deffenbaugh's sentence was not "plainly unreasonable," the standard applicable when, as here, no Guideline exists for the offenses committed.

I

On the evening of May 10, 2009, Larry Deffenbaugh vanished from a fishing boat in the middle of the Chesapeake Bay while on a fishing trip with his brother Wayne. The trip began at Dockside Marina in Virginia Beach, Virginia. Deffenbaugh was a licensed sea captain, who had piloted everything from fishing boats to large corporate-owned yachts, eventually earning a Master-level captain's license through the U.S. Coast Guard. His brother Wayne did not have the same experience and was not in good health. Wayne was legally blind and suffered from diabetic comas.

Nonetheless, on the evening of May 10, Deffenbaugh instructed his brother to drive the boat while Deffenbaugh was near the fishing gear at the stern. When Wayne was looking forward, Deffenbaugh jumped off the boat and disappeared. Wayne soon discovered Deffenbaugh's absence and, unsure whether he was playing a joke, began yelling for him and looking for him. After failing to find him, he believed that

Deffenbaugh may have drowned and placed an emergency call to 911.

The 911 call was received by the Virginia Beach Emergency Communication and Citizens Services and forwarded to the U.S. Coast Guard, which immediately responded. It initiated a search-and-rescue operation, dispatching small boats, an 87-foot cutter, a U.S. Navy ship, helicopters, and aircraft. When it found Wayne, he was disoriented and upset. The Coast Guard continued the search for Deffenbaugh for some 15 hours before giving up on finding him. The search cost the Coast Guard $220,940.

Unbeknownst to the Coast Guard, Deffenbaugh was not lost at sea. In fact, by the time the Coast Guard ended its search, Deffenbaugh was well on his way out of the State, heading south. He had planned his disappearance with his girlfriend, Julie Giannetta, as part of a scheme he concocted to fake his death and thereby avoid a probation violation hearing related to an earlier Maryland conviction. In September 2008, Deffenbaugh had entered an *Alford* plea in a Maryland court to a felony theft charge, receiving a sentence of 15 years' imprisonment, suspended with a condition of 5 years' supervised probation. Several months later, in November 2008, the Maryland Probation Office filed a probation violation petition, alleging that Deffenbaugh failed to present proof that he had sold, transferred, or relinquished possession of a handgun that had been registered to him. If found in violation of his probation, Deffenbaugh was subject to having his suspended sentence reinstated. The Probation Office scheduled a hearing on the alleged violation for May 12, 2009. Deffenbaugh staged his "death" on May 10, 2009.

After jumping off the fishing boat that his brother was driving, Deffenbaugh swam to shore and called Giannetta, who, as had been prearranged, was waiting to pick him up. Deffenbaugh and Giannetta then drove to Texas. After receiving a tip from a viewer of America's Most Wanted, local police and

U.S. Marshals arrested Deffenbaugh some nine months after his disappearance, on February 16, 2010, in Baytown, Texas, where he was living under the name "Mike Meyers."

Shortly after his arrest, Deffenbaugh was indicted on one count of causing a false distress message to be communicated to the U.S. Coast Guard, in violation of 14 U.S.C. § 88(c). After a four-day trial, the jury could not reach a verdict, and the district court declared a mistrial. During the trial, however, Julie Giannetta approached the government and offered to testify against Deffenbaugh in exchange for immunity, and the government agreed. Having Giannetta's cooperation, the government filed a two-count superseding indictment charging Deffenbaugh with (1) conspiracy to violate 14 U.S.C. § 88(c), in violation of 18 U.S.C. § 371; and (2) the substantive offense of violating 14 U.S.C. § 88(c).

Giannetta testified as a cooperating coconspirator at the second trial, providing the government with its most important testimony. She testified that, prior to his staged disappearance on May 10, 2009, Deffenbaugh had discussed his legal situation with her and had stated that he felt the Maryland authorities were trying to frame him with the gun charge. Deffenbaugh told Giannetta about his plan, as she related it, to "go out in the boat with his brother and make his brother believe he fell overboard or something had happened to him and have him call 911, and then once you went missing long enough, they would file a death certificate." Giannetta also testified about their preparations for the scheme and actions taken in carrying it out. For instance, she stated that Deffenbaugh transferred ownership of his automobile to her a week before he disappeared because Deffenbaugh "was supposed to be, you know, dead after . . . we left." As Deffenbaugh instructed her, Giannetta also lied to Deffenbaugh's brother and sister-in-law in telling them that she was headed to nursing school in Florida so as to create an alibi for her absence. With the alibi established, Giannetta then checked into a local hotel and waited for Deffenbaugh's call during the evening of

May 10. She testified that at dusk on that date, Deffenbaugh called her, and she drove to the prearranged pickup spot where she found Deffenbaugh and fled the area with him. The two stayed in Baytown, Texas, until Deffenbaugh's arrest.

Following a three-day trial, the jury convicted Deffenbaugh on both counts.

The presentence report prepared by the Probation Office concluded that Deffenbaugh had a criminal history Category III, but noted that there was no Sentencing Guideline for either 18 U.S.C. § 371 or 14 U.S.C. § 88(c). In such a circumstance, it noted, the sentencing court was entitled to use a closely analogous guideline or, if there were none, to sentence the defendant using the factors under 18 U.S.C. § 3553(a).

At sentencing, the government argued that the fraud Guideline, U.S.S.G. § 2B1.1, was closely analogous and urged the district court to adopt it. Using that Guideline, the government calculated that the recommended sentencing range would be 78 to 97 months' imprisonment, which reflected a number of relevant sentencing enhancements.[1] Deffenbaugh argued against application of the fraud Guideline and urged the court to sentence him to time served.

The district court concluded that it would not apply the fraud Guideline as it was not sufficiently analogous to use, but it did allow that it was "looking to" that Guideline and

---

[1]The calculation began with the base offense level of 6, as provided in the fraud Guideline § 2B1.1(a)(2), and enhanced by 12 levels based on the amount of loss to the Coast Guard of over $200,000 under § 2B1.1(b)(1)(G), by an additional 2 levels for risk of death or serious bodily injury under § 2B1.1(b)(14)(A), by 2 levels for being a leader or organizer of criminal activity under § 3B1.1(c), by 2 levels for using a special skill under § 3B1.3, and by 2 levels for obstruction of justice under § 3C1.1, thus arriving at a level 26. Coupling that level with a criminal history Category III resulted in the recommended sentencing range of 78-97 months' imprisonment.

would take it "into consideration" when applying the statutory sentencing factors under § 3553(a). After describing an extensive list of aggravating circumstances and determining that a sentence of 84 months' imprisonment was appropriate under § 3553(a), the court sentenced Deffenbaugh to 48 months' imprisonment on Count I and 36 months' imprisonment on Count II, to be served consecutively.

This appeal followed.

## II

Deffenbaugh contends that the evidence failed to show that he and his girlfriend, Julie Giannetta, agreed to pursue "the same criminal objective," as required to prove a conspiracy. "Here, at most, Ms. Giannetta agreed to help Mr. Deffenbaugh avoid his Maryland probation violation hearing. But this is not an offense against the United States," as required by 18 U.S.C. § 371.[2] He maintains that Giannetta "had no knowledge of the [conspiracy's federally unlawful] goal"— *i.e.*, to cause to be communicated a false distress message to the United States Coast Guard—"much less an intent to commit it." And without knowledge of the common goal and intent to commit a *federal* crime, she could not have been a conspirator, as necessary for Deffenbaugh's conviction under § 371. Stated otherwise, Deffenbaugh argues that the members of a § 371 conspiracy must have specific knowledge and intent to violate federal law.

The indictment charged that Deffenbaugh and Giannetta

conspired and agreed together . . . [t]o knowingly and willfully communicate and cause to be communicated a false distress message to the United States

---

[2]Section 371 makes it a crime "[i]f two or more persons conspire either to commit any offense *against the United States*, or to defraud *the United States*." (Emphasis added).

> Coast Guard (Coast Guard) and cause the Coast
> Guard to attempt to save lives and property when no
> help was needed, in violation of Title 14, United
> States Code, Section 88(c).

At trial, the government proved that Deffenbaugh and Giannetta conspired to cause a false distress call to be made for the purpose of faking Deffenbaugh's death and thus avoiding a state probation violation hearing. While the government established that Deffenbaugh intended, as part of the plan, that the Coast Guard receive the call, it did not establish that Giannetta intended or even knew that the Coast Guard would receive the call and become involved. As she testified about her knowledge of the plan:

> Q: Can you tell us what [Deffenbaugh] said about
> disappearing?
>
> A: Yeah. He basically said he was going to go out
> in the boat with his brother and make his brother
> believe he fell overboard or something had happened
> to him and have him call 911, and then once you
> went missing long enough, they would file a death
> certificate. . . . He wanted me to go to the hotel, that
> they wouldn't suspect anything was up, was going
> on. And then he had me pick him up after he was on
> the boat with his brother, and then he wanted us to
> leave town together.

Deffenbaugh argues that Giannetta's knowledge and intent were so limited in respect to the essential *federal* element of the conspiracy that she could not knowingly participate in a conspiracy *to commit a federal offense*, as required by § 371. In other words, he argues that while *he* may have had a plan to commit an offense against the United States, Giannetta did not participate in the same plan.

Despite some logic in this argument, we conclude that it fails as a matter of law.

We begin by noting that § 371 criminalizes an agreement to commit "any offense against the United States." 18 U.S.C. § 371. And in proving a violation of § 371, the government must demonstrate "at least the degree of criminal intent necessary for the [underlying] substantive offense itself." *United States v. Feola*, 420 U.S. 671, 686 (1975). But the intent needed to violate § 371 does not require the government to show that the conspirators knew that their conduct would violate *federal* law, unless the underlying crime included such specific intent. *Id.* Thus, where the object crime does not require that its federal nature be known, the conspiracy statute likewise does not require that knowledge to be demonstrated. *Id.*

The critical language of 14 U.S.C. § 88(c), the object crime in this case, provides that a person commits a federal crime if he or she "knowingly and willfully communicates a false distress message to the Coast Guard or causes the Coast Guard to attempt to save lives and property when no help is needed."[3] This language clearly requires that a perpetrator of a § 88(c) crime specifically intend to make a false distress call or to cause one to be made. And there can be no question that in this case Deffenbaugh and Giannetta knowingly and willfully conspired to cause a false distress call to be made. The question that Deffenbaugh raises is whether the perpetrator must also have knowledge and intent that the recipient of the false distress call be the U.S. Coast Guard. The resolution of this issue is, we conclude, informed by the Supreme Court's

---

[3]Section 88(c) of Title 14 provides:

An individual who knowingly and willfully communicates a false distress message to the Coast Guard or causes the Coast Guard to attempt to save lives and property when no help is needed is—

(1) guilty of a class D felony;

(2) subject to a civil penalty of not more than $5,000; and

(3) liable for all costs the Coast Guard incurs as a result of the individual's action.

decision in *United States v. Yermian*, 468 U.S. 63 (1984), which held that the federal nature of a crime need not be in the mind of the perpetrator.

In *Yermian*, the defendant was convicted of making a false statement to a *federal* agency, in violation of 18 U.S.C. § 1001.**[4]** The defendant appealed his conviction, claiming that even though he did indeed make false statements, he "had no actual knowledge that his false statements would be transmitted to a federal agency" and therefore did not violate § 1001. *Yermian*, 468 U.S. at 66. The Supreme Court rejected this argument, explaining that although the statute required that the defendant "knowingly and willfully" make the false statement to a federal agency, the term "knowingly and willingly" modified only the making of the false statement and not the "jurisdictional requirement" that it be to a federal agency. *Id.* at 68-69. It explained, "[T]he existence of the fact that confers federal jurisdiction need not be one *in the mind of the actor* at the time he perpetrates the act made criminal by the federal statute." *Id.* (emphasis added) (quoting *Feola*, 420 U.S. at 676-77 n.9); *see also United States v. OceanPro Indus., Ltd.*, 674 F.3d 323, 328-29 (4th Cir. 2012).

Similarly, *Feola* held that to violate 18 U.S.C. § 111 (criminalizing the assault of federal officers in the line of duty), the perpetrator *need not know* that his victim is in fact a federal officer. The Court explained that the federal assault statute "cannot be construed as embodying an unexpressed requirement that an assailant be aware that his victim is a federal officer." *Feola*, 420 U.S. at 684. "All the statute requires is an intent to assault, not an intent to assault a federal officer." *Id.*

The analysis of these cases is applicable here. Just as

---

**[4]**At the time, the relevant language of 18 U.S.C. § 1001 provided: "Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully . . . makes any false . . . statements . . . shall be fined. . . ."

§ 1001 punishes anyone who "knowingly and willfully" makes false statements to a federal agency, § 88(c) punishes anyone who "knowingly and willfully" communicates a false distress message to the Coast Guard. And just as the Court in *Yermian* held that *knowledge* that a *federal* agency was involved need not be proved, so too here *knowledge* that the U.S. Coast Guard was involved need not be proved. The "actus reus"—*i.e.*, the prohibited *conduct* of causing a false distress call to be made—must be carried out "knowingly and willfully," but the jurisdictional fact that makes the prohibited conduct a federal crime need not be known, although it must, of course, be proved. *See United States v. White*, 670 F.3d 498, 508 (4th Cir. 2012).

In this case, Deffenbaugh and Giannetta knowingly and willfully entered into a conspiracy with the intent to cause a false distress call to be made. Indeed both intended and expected that the call would not only be made but also that it would be responded to; that the resulting search would be unsuccessful; and that Deffenbaugh would be declared dead. The fact that one or both of the participants did not know that the false distress call would be received by the U.S. Coast Guard does not bear on the unlawfulness *of their conduct* under 18 U.S.C. § 371 and 14 U.S.C. § 88(c). Just as the lack of knowledge and intent that a false statement is made to a *federal* agency or that the victim of an assault is a *federal* officer is no bar to a prosecution for the federal offense, so too the lack of knowledge in this case that the responder to the false distress call will be a federal agency is no bar to a prosecution for a federal conspiracy offense. As the Supreme Court has explained, the fact that Giannetta was "unaware which body of law they intend[ed] to violate" and that a federal agency would be called does not make her participation in the conspiracy "any less blameworthy," nor does it "constitute[ ] less of a danger to society." *Feola*, 420 U.S. at 694.

Accordingly, we reject Deffenbaugh's contention that the evidence was insufficient to convict him of the conspiracy charged in the indictment.

### III

Deffenbaugh also challenges his 84-month sentence, consisting of a 48-month sentence on Count I and a consecutive 36-month sentence on Count II. He contends (1) that the district court erred in applying the Sentencing Guideline for fraud and theft, U.S.S.G. § 2B1.1, to his false distress call conviction; (2) that the court's inappropriate application of the § 3553(a) factors rendered his sentence unreasonable; and (3) that the court failed adequately to explain its decision to impose consecutive sentences. We address these in order.

### A

As Deffenbaugh recognizes, neither 18 U.S.C. § 371 nor 14 U.S.C. § 88(c) has an applicable Sentencing Guideline. In the absence of a Guideline, the court applies "the most analogous offense guideline," and if no Guideline is sufficiently analogous, "the provisions of 18 U.S.C. § 3553 shall control." U.S.S.G. § 2X5.1. We review a sentence imposed for an offense for which there is no Guideline for whether it is "plainly unreasonable." 18 U.S.C. § 3742(a)(4).

The government urged the district court to apply the fraud and theft Guideline, U.S.S.G. § 2B1.1, arguing that a false distress call is an analogous crime. The government noted that if § 2B1.1 were applied, the recommended sentencing level would be 78 to 97 months' imprisonment.

Deffenbaugh objected to the use of that Guideline, principally because it, with the applicable enhancements, would result in a sentence he considered too severe. He argued that the Guideline was not "a close enough fit to serve as an analogous guideline."

In sentencing Deffenbaugh, the district court did not adopt the fraud Guideline, choosing instead to sentence Deffenbaugh using the factors in 18 U.S.C. § 3553(a). But the court

did find the fraud Guideline sufficiently useful to "consider" it and have it "influence" the court's ultimate decision. The court said:

> The government has cited an analogous section of the guidelines, and to some degree there is some analogy that would apply between the fraud and what the defendant did here. Certainly his conduct could be described as fraudulent, among other things.

It appears that the court sought to achieve a sentence in a range informed by the fraud Guideline and the enhancements relevant to it, especially since the court found that the factual bases for the enhancements existed in this case. But it made clear that it was not adopting the Guideline but was only "looking to it" and allowing itself to be "influenced" by it when applying the § 3553(a) factors.

The court then proceeded to find facts as to the enhancements it thought meaningful to its § 3553(a) analysis. It found (1) that Deffenbaugh was "the leader of the conspiracy and pulled his ex-girlfriend into the scheme," inducing her to give false information and causing her to suffer as a result; (2) that he used his "U.S. Navy experience and his maritime experience" to conclude that his actions "would cause the U.S. Coast Guard, and others, to perform an extensive search"; (3) that he placed the searching parties' lives "needlessly in harm's way" and similarly endangered his brother "who had little prior boating experience and who was significantly impaired due to his illnesses, by abandoning him on the boat in the Chesapeake Bay at night"; (4) that he persisted in "efforts to obstruct justice" by evading punishment and using "the false name of 'Mike Meyers' to elude the government's attempts to detain him"; and (5) that during the course of two trials, he "constantly perjured himself."

We conclude that the district court's approach was not plainly unreasonable. At bottom, all of the matters discussed

by the court related directly to its determination to impose a sentence "sufficient, but not greater than necessary, to comply with the purposes [of sentencing]." *See* 18 U.S.C. § 3553(a).

B

Deffenbaugh also challenges his sentence as unreasonable under § 3553(a). He asserts that his "circumstances plainly call for a shorter sentence," emphasizing that his poor health and the length of his sentence would effectively amount to a life sentence. But he made these same arguments to the district court, and the court, in exercising its discretion, found them outweighed, pointing to the numerous other factors that called for a longer sentence.

Deffenbaugh also argues that his 84-month sentence is longer than the sentences given in other cases involving false distress calls. But again, the district court was aware of those cases and did not find them persuasive. The court explained that Deffenbaugh's circumstances were distinguishable because "there are two charges [against him]," the conspiracy and the substantive offense. The court also pointed out that the enhancing factors that it applied to Deffenbaugh may not have existed in the other cases. The court was especially troubled by this case because Deffenbaugh "placed his brother's life in danger."

In these circumstances, we cannot conclude that the sentence given to Deffenbaugh was "plainly unreasonable."

C

Finally, Deffenbaugh argues that the court erred in failing to explain its reasons for imposing consecutive sentences.

Section 3584 of Title 18 governs the imposition of multiple sentences and provides that if multiple terms of imprisonment are imposed *at the same time*, the default rule is to have those

sentences "run concurrently unless the court orders or the statute mandates." 18 U.S.C. § 3584(a). On the other hand, if the terms are imposed *at different times*, the default rule is to have those sentences "run consecutively unless the court orders that the terms are to run concurrently." *Id.* In making the concurrent versus consecutive election, the court must consider the factors in § 3553(a). *See id.* § 3584(b).

In this case, the court spoke at length as to why it was giving the sentence imposed, announcing that it sought to achieve the sentencing level of 84-months' imprisonment, a level it found appropriate when considering the § 3553(a) factors. It then selected sentences under each of the two convictions that, when run consecutively, would achieve the appropriate level.

We find no error in this approach. The court appropriately reached the 84-month sentencing level through a careful consideration of the § 3553(a) factors. Recognizing that the 84-month level would "exceed the total statutory limit for either of the offenses in this case," it entered sentences on each count in a manner that added up to the 84-month sentence. Structuring sentences by running them concurrently or consecutively is an appropriate means to reach a desired sentence. *Cf.* U.S.S.G. § 5G1.3, application note 3(D) (explaining that "the court may exercise its discretion . . . to fashion a sentence of appropriate length and structure it to run in any appropriate manner to achieve a reasonable punishment for the instant offense").

We conclude that Deffenbaugh received the benefit of a reasoned and individualized assessment as to the appropriate level of punishment for his offenses and that the imposition of consecutive sentences was not an unreasonable method to achieve the sentencing goals determined by the court under § 3553(a).

The judgment of the district court is accordingly

*AFFIRMED*.