[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 21-14136

Non-Argument Calendar

_____

UNITED STATES OF AMERICA,

                                                    Plaintiff-Appellee,

*versus*

DEVONNE L. WALKER,
a.k.a. Dee Dee,
a.k.a. Jimmy,

                                                    Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

D.C. Docket No. 5:21-cr-00040-RBD-PRL-1

————————————

Before JORDAN, JILL PRYOR, and BRANCH, Circuit Judges.

PER CURIAM:

Devonne Walker appeals his sentence of 300 months' imprisonment, which was imposed after he pled guilty to one count of conspiring with others to possess with the intent to distribute various controlled substances. Walker argues that the district court made two errors in calculating his sentence: First, he argues that the court erred when it applied a four-level enhancement under the Sentencing Guidelines for Walker's role as an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive. Second, he contends that the court improperly applied a two-level enhancement under the Sentencing Guidelines for possessing a dangerous weapon in connection with a drug offense. Because the record supports the district court's application of these enhancements, we affirm Walker's sentence.

I.

Walker first appeared on the government's radar in March 2018, when an informant indicated that Walker and another man, Chauncy Stackhouse, were selling large quantities of cocaine and methamphetamine. At that time, Walker and Stackhouse were selling approximately two kilograms of cocaine per month, which they obtained from a supplier in Orlando, Florida.

In July 2018, government agents received a tip that Walker, Stackhouse, and two unnamed associates were flying from Tampa, Florida to Puerto Rico to purchase cocaine. Agents stopped Walker, Stackhouse, and their associates at the Tampa airport and seized $80,000 in cash—cash which belonged to Walker and agents believed was intended to be used to buy cocaine. During this time period, Walker and Stackhouse were receiving between four and six kilograms of cocaine each month from their Puerto Rican supplier. The supplier in Puerto Rico transferred the cocaine from Puerto Rico to Florida, then Walker and Stackhouse picked up the cocaine once it arrived in Florida. Walker always paid for the cocaine.

After a few months of working with the Puerto Rican supplier, Walker and Stackhouse decided to find a cheaper source for the drugs. A friend, known to Stackhouse only as "Chad," offered to serve as the middleman connecting Walker and Stackhouse with a drug supplier in Phoenix, Arizona. Walker and Stackhouse eventually decided to cut Chad out of the deal and work directly with their new Arizona contact. From that point on, Walker managed all the dealings with the supplier; he arranged which drugs would be shipped from Arizona to Florida and negotiated the drug prices.

On their first visit to Arizona, Walker and Stackhouse along with an associate named Tyler Reed (also known as "Kyle") met Kanisha Savage at a gas station in Phoenix. They convinced Savage to buy marijuana from a dispensary for them. Walker

gave her money for the purchase. After she purchased the drugs, Savage and the three men smoked marijuana together and exchanged phone numbers.

Walker texted Savage a month after their first encounter, asking whether she knew of any Airbnb rentals in the area because he would be returning to Phoenix soon. He also asked Savage if she would continue buying marijuana from dispensaries for him. She agreed. When Walker, Stackhouse, and Reed returned to Arizona, Walker once again paid Savage to obtain marijuana. This relationship between Walker and Savage continued for some time. Eventually, Walker began requesting that Savage bring him more marijuana than she was able to purchase through dispensaries. Because she could no longer get Walker the amount of marijuana he wanted, Savage introduced Walker to Tymane Hamilton, a known marijuana dealer. Walker and Hamilton entered into an arrangement.

At some point over the course of their relationship, Walker asked Savage to drop off packages at the post office for him in exchange for money. Savage agreed, and their arrangement played out as follows: Walker would inform Savage when she could expect packages and where to pick them up. One of two men would bring sealed packages to wherever Walker directed Savage to go and pay Savage $100 upon giving her the parcels. Walker would send Savage addresses located in the Middle District of Florida and direct her to send the packages to those addresses. Once Sav-

age dropped off the packages with the United States Postal Service ("USPS"), Walker would pay Savage $150 through Cash App.

Under Walker's direction, many packages were mailed from Arizona to Florida. Between July 2018 and October 2019, USPS identified more than 50 parcels sent from Arizona to Florida containing cocaine, heroin, methamphetamine, fentanyl, and marijuana.

Savage also received packages on Walker's behalf. An associate of Walker's named Kathy Stivale sent Savage several packages from Florida. Walker let Savage know in advance when she could expect a package from Stivale; Walker also told Savage what to do with Stivale's packages. The same men who gave Savage packages for Walker collected Stivale's packages.

Savage met Stivale when Stivale accompanied Walker on a trip to Phoenix. During that trip, Stivale was responsible for arranging Walker's transportation. On one occasion, Walker had Savage and Stivale carry cash and money orders for him on a flight from Orlando to Phoenix.

In addition to handling packages and carrying money for Walker, Savage also arranged for Walker to buy a firearm from a man she knew in Phoenix.

As the investigation continued, agents became aware of a residence in Phoenix on 42nd Avenue. They believed it to be a "stash house" used by Walker, Savage, Hamilton, and other members of the conspiracy. Agents observed Walker bringing

shipping supplies into the house and learned that Hamilton and his girlfriend resided there.

In October 2019, agents executed a search warrant for the Arizona residence. They seized nine USPS parcels labeled with addresses in the Middle District of Florida and an AM-15 rifle. Inside the packages, agents found a total of 49.4 kilograms of marijuana and 2.7 kilograms of methamphetamine.

In June of 2021, Walker was indicted for conspiracy to possess with intent to distribute various controlled substances: five kilograms or more of cocaine; 500 grams or more of methamphetamine; one kilogram or more of heroin; 40 grams or more of fentanyl; and more than 50 kilograms or marijuana.[1]

About two weeks later, local Florida police officers executed an arrest warrant for Walker. Officers observed Walker arrive on the scene in his sister's car. After Walker exited the car, a deputy approached the car to confirm there were no other occupants who might threaten officer safety. While looking into the vehicle, the deputy noticed a marijuana blunt in plain view in the front seat center console. Officers decided to search the vehicle. On the floorboard behind the passenger seat, they saw a drawstring bag. Inside the bag they found a 9 mm handgun, drug paraphernalia,

---

[1] Savage and Hamilton were charged as co-defendants. In a separate criminal case, Stackhouse was charged with possession with intent to distribute methamphetamine.

and substances that the officers suspected to be marijuana, heroin, cocaine, fentanyl, and methamphetamine.

Walker pled guilty to the conspiracy charged in the indictment. Before Walker's sentencing hearing, a probation officer prepared a presentencing investigation report ("PSI"). The PSI set forth facts about how the conspiracy operated and Walker's role in the conspiracy. It reported that Walker was accountable for the distribution of 32,460 grams of "ice,"[2] 51,631 grams of marijuana, 79 grams of fentanyl, and 125 grams of heroin. Based on these drug quantities, the PSI assigned Walker a base offense level of 38. The PSI found that Walker should receive a four-level enhancement under U.S.S.G. §3B1.1(a) for being an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive. The PSI also recommended a two-level enhancement under U.S.S.G. §2D1.1(b)(1) because a dangerous weapon (in this case, a firearm) was possessed in connection with a drug offense. The PSI calculated Walker's adjusted offense level as 44. It also noted that Walker was eligible for a reduction in his offense level for acceptance of responsibility.

---

[2] The Sentencing Guidelines define "ice" as "a mixture or substance containing d-methamphetamine hydrochloride of at least 80% purity." U.S.S.G. § 2D1.1, note C.

Walker objected to several portions of the PSI. He objected to some of the paragraphs that described the offense conduct. He also objected to the role and dangerous weapons enhancements.

At the sentencing hearing, the district court overruled these objections. It adopted the PSI's description of the offense conduct. The district court found that the government had shown by a preponderance of the evidence that Walker was an organizer or leader such as to warrant a § 3B1.1(a) enhancement. The district court was also satisfied that the rifle found at the 42nd Avenue residence in Arizona and the handgun seized at Walker's arrest justified a dangerous weapons enhancement under U.S.S.G. § 2D1.1(b)(1).

After accepting the PSI's calculation of the offense level and applying a two-level reduction for acceptance of responsibility, the district court found that Walker had a total offense level of 42 and a criminal history category of VI, yielding a sentence range of 360 months' to life imprisonment.[3] The district court sentenced Walker to 300 months' imprisonment.

Walker timely appealed to this Court.

_____

[3] The court found that Walker was eligible for the career-offender enhancement. Under the career-offender enhancement, Walker's offense level would have been 37 before any reduction for acceptance of responsibility. Because this offense level was not "greater than the offense level otherwise applicable," the district court did not rely on the career-offender enhancement to calculate Walker's guidelines range. U.S.S.G. § 4B1.1(b).

## II.

We accept a district court's factual findings at sentencing unless clearly erroneous. *United States v. Caraballo*, 595 F.3d 1214, 1230 (11th Cir. 2010). A factual finding is clearly erroneous when, upon review of the evidence, the Court is "left with a definite and firm conviction that a mistake has been committed." *United States v. Foster*, 155 F.3d 1329, 1331 (11th Cir. 1998). Whether a defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive is a factual finding we review for clear error.[4] *United States v. Ramirez*, 426 F.3d 1344, 1355 (11th Cir. 2005). The same is true for whether a dangerous weapon was possessed in connection with a drug crime. *United States v. Stallings*, 463 F.3d 1218, 1220 (11th Cir. 2006).

We review a district court's application of the Sentencing Guidelines to the facts *de novo*. *United States v. Smith*, 22 F.4th 1236, 1242 (11th Cir. 2022).

---

[4] The government argues that the district court's determination as to Walker's § 3B1.1 role enhancement should be reviewed for plain error, arguing that Walker did not raise the specific issues he advances here in the district court. *See United States v. Aguillard*, 217 F.3d 1319, 1320 (11th Cir. 2000). We assume Walker sufficiently raised the issue at the district court level and proceed under the clear-error standard because the result we reach is the same under either standard of review.

III.

Walker challenges the district court's application of the leadership role and dangerous weapons enhancements in calculating his sentencing range.

We affirm the district court's application of a four-level § 3B1.1(a) role enhancement because the record supports the district court's conclusion that Walker led or organized a criminal activity that involved at least five participants or was otherwise extensive. We also affirm the application of a § 2D1.1(b)(1) dangerous weapons enhancement because a co-conspirator possessed a firearm in connection with the conspiracy, and the possession was reasonably foreseeable in light of the volume and value of the drugs involved in the offense.

A.

The Sentencing Guidelines mandate a four-level increase to a defendant's offense level if (1) he "was an organizer or leader of a criminal activity" (2) "that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a). These are two separate and distinct requirements for a sentence enhancement under § 3B1.1(a). *United States v. Martinez*, 584 F.3d 1022, 1026 (11th Cir. 2009).

On appeal, Walker challenges the district court's evaluation of the second prong—that the criminal activity involved either five or more participants or was otherwise extensive. Walker argues that the district court failed to articulate its findings as to

this prong with sufficient specificity. He points out that the district court did not explicitly name the five people it considered participants in the criminal activity, nor did it specify whether the application of § 3B1.1(a) was based on there being at least five participants in the criminal activity or on the criminal activity being otherwise extensive. Instead, at the sentencing hearing, the district court simply stated that it "f[ound] the Government ha[d] met its burden of proof by a preponderance of the evidence that Mr. Walker was an organizer, manager, or leader of the organization such as to warrant the four-level enhancement under 3B1.1(a)." Doc. 134 at 186.[5]

This was all the district court needed to say. Walker's argument that the district court's failure to make specific findings warrants reversal has no basis in our precedent. As this Court has previously held,

> [i]n making the ultimate determination of the defendant's role in the offense, the sentencing judge has no duty to make any specific subsidiary factual findings. So long as the district court's decision is supported by the record and the court clearly resolves any *disputed* factual issues, a simple statement of the district court's conclusion is sufficient.

---

[5] "Doc." numbers refer to the district court's docket entries in this case.

*United States v. Rodriguez De Varon*, 175 F.3d 930, 939 (11th Cir. 1999) (en banc) (emphasis in original) (internal citation omitted) (regarding mitigating-role reduction under U.S.S.G. § 3B1.2).

There is no question here that the district court resolved all disputed factual issues. And whether the § 3B1.1(a) leadership-role enhancement was based on the number of participants or the extent of the criminal activity, the record supports the district court's conclusion.

First, as to the number of participants, the record shows by a preponderance of the evidence that at least five people participated in the conspiracy to possess controlled substances with the intent to distribute. "A 'participant' is a person who is criminally responsible for the commission of the offense, but need not have been convicted." U.S.S.G. § 3B1.1 cmt. 1. Walker and his two co-defendants, Kanisha Savage and Tymane Hamilton, are participants under § 3B1.1(a). Evidence of more than two additional participants exists in the record, including but not limited to: (1) Chauncy Stackhouse, a co-conspirator who began distributing drugs with Walker as early May 2018, traveled with Walker to Arizona to arrange drug shipments back to Florida on numerous occasions, and helped Walker orchestrate cocaine shipments from Puerto Rico to Florida; (2) Tyler Reed, also known as "Kyle," who traveled to Arizona with Walker and Stackhouse on more than one occasion and helped recruit Savage into the conspiracy; (3) Kathy Stivale, who, like Savage, worked for Walker and shipped packages across the country on his behalf; (4) Chad, who

arranged a new supplier for Walker in Arizona; and (5) the two men who delivered boxes of drugs to Savage for her to label and ship to Florida.

Second, even though, in light of the number of participants, establishing that the criminal activity was otherwise extensive was unnecessary, the record supports such a finding. We consider several factors when examining a criminal activity's extensiveness, including the length and scope of the criminal activity and the number of persons or entities involved. *United States v. Holland*, 22 F.3d 1040, 1046 (11th Cir. 1994); *see, e.g.*, *United States v. Rodriguez*, 981 F.2d 1199 (11th Cir. 1993) (finding a drug transaction that extended through three states and another country and involved the distribution of 100 kilograms of cocaine to be otherwise extensive); *United States v. Gupta*, 463 F.3d 1182, 1198 (11th Cir. 2006) (finding a seven-year fraud scheme that involved "seven corporations, numerous straw owners, [and] Medicare reimbursements of over $15 million" to be otherwise extensive). Furthermore, "[i]n assessing whether an organization is 'otherwise extensive,' all persons involved during the course of the entire offense are to be considered. Thus, a fraud that involved only three participants but used the unknowing services of many outsiders could be considered extensive." U.S.S.G. § 3B1.1 cmt. 3.

The scope of the criminal activity here was extensive. The conspiracy involved large quantities of drugs. Walker pled guilty to possessing with intent to distribute five kilograms or more of cocaine, 500 grams or more of methamphetamine, one kilogram

or more of heroin, 40 grams or more of fentanyl, and 50 kilograms or more of marijuana. The PSI specifically attributed to Walker the distribution of 32,460 grams of near-pure methamphetamine, 51,631 grams of marijuana, 79 grams of fentanyl, and 125 grams of heroin. And these large quantities of drugs were shipped across state lines, with more than 50 parcels of cocaine, heroin, methamphetamine, fentanyl, and marijuana traveling between Arizona and Florida between July 2018 and October 2019. At one point during the conspiracy, cocaine was also coming in from Puerto Rico. In addition, the scheme hinged on the unknowing services of many outsiders—the USPS employees who unwittingly transported and delivered over 50 parcels of controlled substances. We thus conclude that Walker's criminal activity could be considered "otherwise extensive" given its scope and number of participants involved, including both knowing and unknowing participants.

For all the above reasons, the district court did not err—clearly or otherwise—in determining that Walker was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive under § 3B1.1(a).

## B.

The Sentencing Guidelines mandate a two-level sentencing increase "[i]f a dangerous weapon (including a firearm) was possessed" in connection with a drug offense. U.S.S.G. § 2D1.1(b)(1). To justify a § 2D1.1(b)(1) dangerous-weapons enhancement, the government must establish by a preponderance of the evidence

that either (1) "the firearm was present at the site of the charged conduct" or (2) "the defendant possessed a firearm during conduct associated with the offense of conviction." *United States v. Stallings*, 463 F.3d 1218, 1220 (11th Cir. 2006). Once the government meets its initial evidentiary burden, the burden shifts to the defendant to "demonstrate that a connection between the weapon and the offense was clearly improbable." *Id.* (internal quotations omitted).

A § 2D1.1(b)(1) dangerous-weapons enhancement may be applied when a firearm is possessed by a co-conspirator rather than the defendant himself. *United States v. Fields*, 408 F.3d 1356, 1359 (11th Cir. 2005). To apply the enhancement to a defendant based on co-conspirator possession, the government must prove by a preponderance of the evidence that "(1) the possessor of the firearm was a co-conspirator, (2) the possession was in furtherance of the conspiracy, (3) the defendant was a member of the conspiracy at the time of possession, *and* (4) the co-conspirator possession was reasonably foreseeable by the defendant." *United States v. Gallo*, 195 F.3d 1278, 1284 (11th Cir. 1999) (emphasis in original).

Here, the government offered three firearms to justify a dangerous-weapons enhancement: (1) a rifle seized during the search of the Arizona stash house maintained by co-defendant Hamilton; (2) a loaded handgun found behind the front passenger seat of the vehicle Walker drove immediately before his arrest; and (3) a firearm co-defendant Savage arranged for Walker to buy

in Arizona. The district court found that two firearms—the firearm recovered from Hamilton's Arizona residence and the firearm found inside the vehicle at Walker's arrest—satisfied the government's initial evidentiary burden under § 2D1.1(b)(1). The court also found that Walker failed to demonstrate that a connection between the weapons and the offense was clearly improbable.

We turn first to the rifle connected to co-defendant Hamilton. Walker does not dispute that: (1) Hamilton was a co-conspirator who possessed a firearm, (2) the possession was in furtherance of the conspiracy, or (3) Walker was a member of the conspiracy at the time Hamilton possessed the firearm. Instead, Walker argues that there is no evidence to show that he knew about Hamilton's firearm or that he should have reasonably foreseen his co-conspirator's firearm possession. Thus, only the fourth prong of *Gallo* is at issue.

We therefore focus on whether it was reasonably foreseeable to Walker that Hamilton would possess a firearm. In this inquiry, it is not required that Walker knew about Hamilton's firearm possession; the question is whether the possession was reasonably foreseeable. *United States v. Martinez*, 924 F.2d 209, 210 (11th Cir. 1991).

Our precedent recognizes that "guns are a tool of the drug trade. There is a frequent and overpowering connection between the use of firearms and narcotics traffic." *United States v. Cruz*, 805 F.2d 1464, 1474 (11th Cir. 1986). Because of this connection,

we have found it reasonably foreseeable that a co-conspirator would possess a firearm when the conspiracy involves trafficking large quantities of valuable illegal drugs. *United States v. Pham*, 463 F.3d 1239, 1246 (11th Cir. 2006).

Here, the rifle was seized at an Arizona stash house used by multiple co-conspirators to facilitate drug-trafficking activities. There were approximately 49.4 kilograms of marijuana and 2.7 kilograms of methamphetamine in the house at the time agents seized the rifle. Those drugs were destined for Florida; agents found them in parcels already addressed with handwritten labels to various locations in the Middle District of Florida. In addition to the specific drugs found at Hamilton's residence the day agents executed their search warrant, we reiterate, Walker pled guilty to conspiring to possess with the intent to distribute five kilograms or more of cocaine, 500 grams or more of methamphetamine, one kilogram or more of heroin, 40 grams or more of fentanyl, and 50 kilograms or more of marijuana. And, again, the PSI specifically attributed to Walker 32,460 grams of "ice," 51,631 grams of marijuana, 79 grams of fentanyl, and 125 grams of heroin.

We have no trouble concluding that Walker could have reasonably foreseen a co-conspirator's possession of a firearm in light of the sheer quantity and value of drugs he and his co-conspirators possessed and trafficked. The district court did not clearly err in applying a two-level dangerous weapons enhancement to Walker based on his co-conspirator's possession.

Because the co-conspirator firearm is sufficient to justify the § 2D1.1(b)(1) sentencing enhancement, we need not address the firearm found in the vehicle Walker drove the day of his arrest.

## IV.

For the above reasons, we conclude that the district court did not err in applying the four-level leadership-role enhancement pursuant to § 3B1.1(a) or the two-level dangerous-weapon enhancement pursuant to § 2D1.1(b)(1).[6]  The district court's judgment is affirmed.

**AFFIRMED.**

---

[6] After the parties completed briefing in this appeal, Walker, proceeding *pro se*, submitted a letter to the court arguing that the district court erred in finding that he qualified as a career offender. He relied on our recent decision in *Dupree v. United States*, in which we held that the crime of conspiring to possess with intent to distribute a controlled substance offense did not qualify as a "controlled substance offense" for purposes of the career-offender enhancement.  57 F.4th 1269, 1271 (11th Cir. 2023) (en banc).

But even assuming the district court erred in finding that Walker qualified as a career offender, any error was harmless. Without the career-offender enhancement, Walker's guidelines range would be the same because his total offense level and criminal history category would not change.